Leontine Turcotte, administratrix, *vs.* Marines E.
DeWitt
(and three companion cases[1]).

Bristol.  October 25, 1954. — February 3, 1955.

Present: Qua, C.J., Lummus, Wilkins, Spalding, & Williams, JJ.

*Negligence,* Motor vehicle.  *Evidence,* Of life expectancy;  Opinion: ex-
pert.  *Error,* Whether error harmful.  *Practice, Civil,* Exceptions:
whether error harmful;  Verdict.  *Jury and Jurors.*

Evidence that a furniture van proceeding north on a three lane highway
one night when the weather was clear and the road was dry collided
with an automobile proceeding south "just on the inside" of the
westerly lane at a point where the road was straight a short distance
north of a curve warranted a finding of negligence on the part of the
operator of the van toward the operator of the automobile.  [161–162]
Error prejudicial to the defendant at the trial of an action for death
under G. L. (Ter. Ed.) c. 229, § 2, as appearing in St. 1947, c. 506,
§ 1A, was not shown by the admission of testimony of an actuary,
qualified as an expert, as to the life expectancy of the deceased ac-
cording to an experience table of mortality identified by the witness
and in general use, where the witness without objection had previ-
ously testified to the same expectancy on the basis of his own ex-
perience.  [163–164]
At the trial of an action arising from a collision of automobiles on a pub-
lic highway, testimony by a police officer and by an inspector of motor
vehicles as experts with respect to skid marks on the highway which
were fully described to the jury related to a subject within the com-
prehension of the jury and was properly excluded.  [164–165]
Error harmful to the defendant at the trial of an action for death was
not shown by failure of the trial judge to reveal to counsel the contents
of a sealed verdict rendered by the jury upon reconvening after a
separation, which the judge examined and returned to them for fur-
ther consideration after ascertaining that no juror had talked with
anyone about the case during the separation and giving correct instruc-
tions on the minimum and maximum statutory limits of liability gov-
erning their verdict, or in recording a verdict for the plaintiff within
the statutory limits subsequently rendered by them.  [165–166]

[1] The companion cases are by the same plaintiff, two against Kahn Trans-
portation Company, Inc., and one against Marines E. DeWitt.

Silence of a jury hearing an action when asked directly by the judge whether they had talked with anyone about the case during a period in which they were separated after the case had been submitted to them was properly construed by the judge as meaning that they had not done so and there was no error in further consideration of the case by them. [166–167]

FOUR ACTIONS OF TORT. Writs in the Superior Court dated January 4, 1950, and February 27, 1950.

The actions were tried before *Warner,* J.

*Gerald P. Walsh,* for the defendants.

*Benjamin G. Sykes,* for the plaintiff.

SPALDING, J. These are four actions of tort brought by Leontine Turcotte, administratrix of the estate of Hubert A. Turcotte. Two actions are brought against Kahn Transportation Company, Inc., and two are brought against Marines E. DeWitt. The plaintiff seeks to recover against each defendant for death, conscious suffering, and property damage. The judge directed a verdict for each defendant on the count for conscious suffering. The counts for death and property damage were submitted to the jury and verdicts in favor of the plaintiff on these counts were returned by the jury. The cases come here on the defendants' exceptions to the denial of their motions for directed verdicts, to certain rulings relating to evidence and the conduct of the trial, and to the denial of their motions for a new trial.

We summarize the evidence as follows: About 7:15 in the evening of December 22, 1949, the plaintiff's intestate, hereinafter called the deceased, was driving his automobile on Broadway, a public highway in the city of Taunton. Broadway is a three lane highway, each lane being 10 feet in width, which runs substantially north and south. The weather was clear and the road was dry. On each side of the road there is a tar shoulder or gutter 2 feet in width. Immediately prior to the accident the deceased was driving south toward Taunton and a furniture van owned by the defendant Kahn Transportation Company, Inc., and operated by its employee, the defendant DeWitt, was pro-

ceeding north. At the point where the accident occurred
the road was straight. About 75 to 100 feet south of this
point the road makes a turn to the left, which would be a
right turn for a vehicle proceeding north. Just prior to the
accident the deceased was travelling "at a normal rate of
speed in his own right" or westerly lane. While proceed-
ing thus the furniture van collided with the automobile of
the deceased and pushed it to within 2 feet of the westerly
curbing. The left front portion of the van struck the left
front portion of the deceased's automobile. The vehicles
"came together just on the inside of the right lane facing
south toward Taunton."[1] The automobile of the deceased
was badly damaged and the deceased sustained severe in-
juries. He was dead when seen by the medical examiner
about a half hour after the accident. There was no evi-
dence of conscious suffering.

1. The judge did not err in denying the defendants'
motions for directed verdicts. True, there was evidence
which would have warranted a finding that there was no
negligence on the part of the operator of the van or that
the deceased was guilty of contributory negligence, but the
jury were not obliged to believe it. On the evidence most
favorable to the plaintiff it could have been found that the
van collided with the deceased's automobile on the westerly
lane, which would be the deceased's right hand lane. If
the jury believed that the accident occurred at this point
in the road they could have found negligence on the part
of the operator of the van. The question was one of fact
for the jury to decide.

2. When the accident occurred G. L. (Ter. Ed.) c. 229,
§ 2, as appearing in St. 1947, c. 506, § 1A, was in force.
This section, so far as material, provided that "if any per-
son . . . [by his negligence] causes the death of a person
in the exercise of due care who is not in his . . . em-

---

[1] There was other evidence that immediately prior to the collision the
automobile of the deceased "shot right out and hit right into the left hand
side" of the van and that at the point of collision "no more than 2 feet or
so" of the van extended beyond the line separating the most easterly lane
from the center lane.

ployment or service, he . . . shall be liable in damages, in an amount not less than two thousand nor more than fifteen thousand dollars, to be assessed with reference to the pecuniary loss sustained by the parties entitled to benefit hereunder . . . ." (See now G. L. [Ter. Ed.] c. 229, § 2C, inserted by St. 1949, c. 427, § 3, restoring the degree of culpability of a defendant as the measure of damages.) Under such a statute the plaintiff was entitled to show the probable span of the deceased's life in order to establish the pecuniary loss sustained. *Durdle* v. *Baron*, 328 Mass. 460, 463. One Boermeester, called by the plaintiff, whose qualifications as an expert were conceded by the defendants, testified that he had been an actuary for 21 years and was an assistant actuary of John Hancock Mutual Life Insurance Company. He further testified that there is a table known as the American Experience Table of Mortality and he identified such a table. He then stated, without objection, that from his experience the deceased, based on his age when he died, would have had a life expectancy of 21.1 years. Counsel for the plaintiff then asked what according to the mortality table would be the deceased's expectancy of life. Over the objection and exception of the defendants the witness was permitted to answer that the expectancy would be 21.1 years. The following then appears in the record: "This witness further testified that the mortality table, which he had identified, was not used by him in connection with his work as an actuary and that he based his answer on the fact that the table had had precedence in the courts for a number of years to show the expectation of life of men of this age. The rates, the expectation of life, compare very close to other tables in use at this time for persons 49 and over. Counsel for the defendant then moved to strike out all his testimony concerning the actuary table and life expectancy and the following colloquy occurred: Counsel for the defendants: Then on the basis of that, may I move that the witness's testimony be stricken out, all of his testimony concerning this table and what it shows relative to life expectancy. The judge: No. I will save

your exception.  COUNSEL FOR THE DEFENDANTS: My exception."

It has been held both here and elsewhere that standard mortality tables are admissible to prove the probable duration of a person's life.  *Banks* v. *Braman*, 195 Mass. 97, 99. *Hanley* v. *Boston & Maine Railroad*, 286 Mass. 390, 399. Wigmore on Evidence (3d ed.) § 1698.  The objection of the defendants does not appear to have been based on the fact that the table was not a standard one.  In any event we think enough appeared to show that it was one in general use.  Nor was the objection based on the fact that the table itself was not introduced in evidence.  Morever the expectancy contained in the table did not differ from that which the witness testified to without objection on the basis of his own knowledge.  There was no prejudicial error.

3. One Fahey, a police officer called by the plaintiff, testified that he went to the scene of the accident and observed the position of the vehicles involved in it.  "He drew a sketch on the blackboard to indicate the position of the vehicles as he saw them after the accident and the car was placed in the right lane, the truck was placed up against the left side of the front of the car, and that he saw a mark on the road.  It was a skid mark and it ran from a point about 2 feet from the white line of the most easterly lane and he paced off 21 paces to the front of the truck, that he saw dirt, mud and sand scattered around in the area and pieces of glass and wreckage, that he couldn't say where it came from."  The witness then stated, in response to a question put by the defendants' counsel, that he had investigated some accidents before the present one.  He was then asked the following questions: "Had you had occasion to see marks on the highway left by vehicles that were involved in an accident?"  "Do you have an opinion, based on your experience as to whether or not these marks that you saw on the highway were caused by the vehicles that were in this collision?"  Both questions were excluded.  The defendants offered to prove that the expected answer of the witness would be that the "scrape mark leading from the

easterly — near the easterly line over to where the vehicles were at rest was caused by the two vehicles that had been in collision." To the exclusion of this evidence the defendants excepted.

There was no error. Where a matter may easily be comprehended by jurors the testimony of an expert has no place. *New England Glass Co.* v. *Lovell*, 7 Cush. 319, 321. *Lynch* v. *C. J. Larivee Lumber Co.* 223 Mass. 335, 340. *Lavoie* v. *Brockelman Brothers, Inc.* 315 Mass. 673, 677. On the other hand, if the subject is of such character or complexity that it cannot be assumed to be within the ordinary experience or knowledge of men, the testimony of an expert is admissible. *Jackson* v. *Anthony*, 282 Mass. 540, 544. The jury were given a full description of the marks on the road and the subject was such as to be easily comprehended by them. There was no necessity for expert testimony.

For like reasons the similar questions put to the witnesses George and Tinkham, inspectors of motor vehicles, were also rightly excluded.

4. The defendants complain of the manner in which the verdicts were received and recorded by the judge. The cases were submitted to the jury in the afternoon of December 17, 1952, and they were instructed that they could render a sealed verdict and reconvene on the following morning. The next morning the jury returned sealed verdicts which were scrutinized by the clerk and the judge but were not seen by counsel. The judge then said to the jury: "Well, I think I find occasion to return these blanks to you for further consideration, but I can't do so unless I first know whether anyone of you have ever talked with a human being about this case since you departed. Has anyone?" There being no response, the judge said, "We can go ahead with the assurance that you didn't have a talk with any one since dispersing last evening." He then told the jury that the death statute fixed the limits of liability at not less than $2,000 nor more than $15,000 and that "any finding at all will just have to be in accordance with that statute." Counsel for the defendants excepted to this

procedure. The jury later returned with verdicts for the plaintiff on the counts for death in the amount of $15,000 and these verdicts were recorded. To the recording of these verdicts the defendants excepted.

The defendants argue that the judge ought to have revealed the contents of the slips first returned by the jury, for without such knowledge counsel were unable to determine whether the additional instructions fairly stated the law. It is not unreasonable to infer that the judge refused to record the verdicts because the amounts awarded were not in conformity with the statute. All that the judge did was to bring to their attention the minimum and maximum limits of the statute. It is difficult to see how the defendants could have been harmed by this procedure. Everything that the jury were told about the statute was correct.

The defendants further argue that the failure of the jury to respond to the judge's question as to whether they had discussed the case with anyone since they had separated did not satisfy legal requirements. The foreman, it is argued, "should have been allowed and, indeed, required to make some definite negative statement after due conference and inquiry among all the jurors."

It is settled that "The mere circumstance of a separation of the jury . . . does not require the ending of the trial, but the judge rightly may require further and renewed consideration of the case by the jury provided he determines upon adequate investigation that nothing prejudicial to the cause of justice has happened during the separation." *Dziegiel* v. *Westford*, 274 Mass. 291, 295. *Charles* v. *Boston Elevated Railway*, 230 Mass. 536. *Enga* v. *Sparks*, 315 Mass. 120, 126.

While the judge might have sent the jury out to ascertain whether anything prejudicial had occurred during separation as was done in the *Charles* case, that procedure was not required. "It is an ancient and proper course for the trial judge to question the jury directly and to accept their answers through the foreman or by general assent, or, in extraordinary cases, by a poll, as the basis for judicial

action affecting rights of parties." *Dziegiel* v. *Westford*, 274 Mass. 291, 296. What was done in the cases at bar was in conformity with this statement. The jury were directly asked by the judge whether they had talked with anyone and their silence must be taken to mean that they had not. See *Shields* v. *Nathans*, 268 Mass. 360, 364–365.

5. The exceptions to the denial of the defendants' motions for a new trial require no discussion. All grounds now pressed in support of the exceptions have already been discussed elsewhere in this opinion.

*Exceptions overruled.*