WILLIAM HARLOW *vs*. DANNY CHIN & another.[1]

Suffolk.    September 14, 1988. — October 19, 1989. ·

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Negligence*, Medical malpractice, Doctor, Proximate cause, Duty to warn, Comparative. *Medical Malpractice*, Expert opinion, Recovery from collateral source. *Proximate Cause. Practice, Civil*, Argument by counsel, Instructions to jury. *Subrogation. Evidence,* Expert opinion. *Charity. Corporation*, Charitable corporation.

At the trial of a medical malpractice action wherein it was alleged that the negligence of a licensed physician and a hospital caused a patient to become a quadriplegic, there was sufficient evidence to warrant a finding that the physician was negligent in his examination of the patient, in his failure to explore other possible diagnoses, and in his failure to give the patient warnings and explanations adequate for follow-up care. [701-702]

At the trial of a medical malpractice action brought by a patient who had become a quadriplegic, the plaintiff's evidence was sufficient to present a jury question as to causation. [702-703] O'CONNOR, J., with whom NOLAN and LYNCH, JJ., joined, dissenting.

Although, at the trial of a medical malpractice action, the argument by plaintiff's counsel concerning money damages improperly indulged in significant references to numerical amounts which had no basis in the record, the judge's curative instructions to the jury eliminated the need for a new trial. [703-706] LYNCH, J., with whom NOLAN, J., joined, dissenting.

At the trial of a medical malpractice action there was sufficient evidence to warrant the jury's determination that the patient was thirteen per cent at fault under the comparative negligence statute. [706-708]

General Laws c. 231, § 60G, which provides for medical malpractice damages to be reduced by the amount of payments a plaintiff receives from collateral sources, other than those collateral sources "whose right of subrogation is based in any federal law," did not require that a malpractice plaintiff's award be reduced by the amount of Medicare or Medicaid benefits he had received, because these benefits entailed federally based subrogation rights [708-712]; however, the judge was to consider on remand whether any Federal right of subrogation existed

[1] Massachusetts General Hospital.

with respect to the Social Security benefits the plaintiff had received, and whether these benefits duplicated any part of the jury's award [712].

At the trial of a medical malpractice action, the judge did not err in his instructions to the jury with regard to a physician's negligence and warnings to his patient. [712-713]

At the trial of a medical malpractice action wherein it was alleged that the defendants' negligence had caused the plaintiff to become a quadriplegic, there was sufficient evidence, including the plaintiff's expert's testimony based on mortality tables and the expert's admission on cross-examination that generally the life expectancy of a quadriplegic was shorter, to support the jury's finding of thirty-one and one-half years as the amount of time over which an award for future medical expense and future pain and suffering was meant to compensate the plaintiff. [713-714]

There was no merit to the contentions by the defendants in a medical malpractice action that the plaintiff's expert was outside his area of expertise in testifying about the plaintiff's future medical costs, and that the expert impermissibly commented about the testimony of another of the plaintiff's experts when he compared his figures with those of the other expert. [714-715]

Where, at the trial of a medical malpractice action, a hospital proved both that it was a charitable organization, and that the tort complained of "was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation," the judgment entered against the hospital should have been limited to twenty thousand dollars, pursuant to G. L. c. 231, § 85K (1988 ed.) [715-716]

CIVIL ACTION commenced in the Superior Court Department on December 28, 1982.

The case was tried before *Ernest S. Hayeck*, J., sitting under statutory authority.

The Supreme Judicial Court granted a request for direct appellate review.

*Edward B. Hanify (Thomas H. Hannigan, Jr., & Lee C. Rubin* with him) for the defendants.

*Frederic N. Halstrom (Maureen A. Griffin & Peter A. Donovan* with him) for the plaintiff.

*James M. Shannon*, Attorney General, & *Lawrence P. Fletcher-Hill*, Assistant Attorney General, for Department of Public Welfare, amicus curiae, submitted a brief.

ABRAMS, J. The defendants in this medical malpractice action appeal from a judgment in favor of the plaintiff, William Harlow. The plaintiff alleges that the negligence of Dr. Danny Chin and Massachusetts General Hospital caused him to become a quadriplegic. The jury, in answer to special questions, found the defendants negligent, and found the plaintiff thirteen per cent comparatively negligent. A judgment for $6,660,720, not including prejudgment interest, was entered against both defendants.[2] The defendants argue that the evidence was insufficient to support a finding of either negligence or causation, that improper arguments of plaintiff's counsel necessitated a new trial, that the judge erred in his application of the medical malpractice statute, G. L. c. 231, § 60G (1988 ed.), and that the judge made other erroneous rulings. The plaintiff cross appeals, claiming that the evidence is insufficient to support a finding of thirteen per cent comparative negligence. We granted the defendants' application for direct appellate review.

We conclude that the record contains sufficient evidence to support the jury award, and that the plaintiff's closing arguments, although improper, do not necessitate a new trial. We remand to the Superior Court, however, to enter a judgment against Massachusetts General Hospital limited by the statutory cap of $20,000, pursuant to G. L. c. 231, § 85K (1988 ed.), and to determine whether certain prejudgment benefits received by the plaintiff should be deducted from the award against Dr. Chin.

---

[2] After judgment entered, it became clear that the jury mistakenly included $388,930.92 in the award. That amount by all accounts had not been proved by the plaintiff as past medical expenses. The judge ordered a remittitur in the amount of $388,930.92. A new judgment of $6,322,350.10, reflecting the remittitur, was entered on March 25, 1987. Apparently because of a clerical error, the judgment was entered only against Dr. Chin, and not against Massachusetts General Hospital. At that time, the defendant Massachusetts General Hospital contended that any judgment against it must be limited to $20,000. It secured an order from a single justice of the Appeals Court denying entry of a judgment against the hospital and ordering that the parties brief, as part of the appeal, issues going to the amount of the judgment against the hospital, and whether the amount should be limited to the amount of charity immunity pursuant to G. L. c. 231, § 85K (1988 ed.). See *infra* at 715-716.

In the light most favorable to the plaintiff, the jury could have found the following facts. On February 11, 1982, the plaintiff slipped and fell while working on an oil truck. He hit the back of his neck and his head on the seat. The plaintiff felt a sharp pain in his left leg, the back of his neck, and his trapezius area, and a sharp pain from his left shoulder down to his left hand. He felt tingling in the fingertips of his right hand. The pain did not go away by itself. On February 15, 1982, the plaintiff sought medical care at Chelsea Memorial Health Care Center, a unit of Massachusetts General Hospital.

After speaking to a receptionist and a triage nurse, the plaintiff was examined by Dr. Chin. The plaintiff told Dr. Chin that he had hit the back of his neck, and that he was experiencing pain down his neck and upper back, and down his arm and into his hand, and that he felt tingling in the fingertips of his right hand. Dr. Chin spent from two to five minutes examining the plaintiff. Dr. Chin felt the back of the plaintiff's neck and tapped his elbows and kneecaps. The medical history Dr. Chin recorded during the examination consisted of "[c]omplaints of pain, left trapezius, increased by turning head or lifting, exam." His examination was recorded as "[l]eft trapezius tender and in spasm, left shoulder full range of motion, no tenderness, deep tendon reflexes, bi[c]eps equal to two plus bilaterally." Dr. Chin diagnosed the plaintiff as having a muscle spasm. Dr. Chin recommended no heavy lifting. He told the plaintiff to apply heat and take aspirin and Flexeril, a muscle relaxant that he prescribed. Dr. Chin failed to tell the plaintiff to return if the pain stayed the same or got worse.

The plaintiff took the Flexeril for the next ten days. He stayed home from work for eighteen days because of the pain. On March 5, 1982, the pain became worse and entered the plaintiff's right leg for the first time. The plaintiff returned to the hospital and collapsed while getting onto an examination table. He was rushed to Massachusetts General Hospital, where it was determined that he had a herniated cervical disc at the C-4, C-5 level. The plaintiff underwent surgery, which was unsuccessful. The plaintiff is now quadriplegic and will be so for life.

1. *Negligence.* "To entitle the plaintiff to go to the jury there must be sufficient evidence to warrant a finding (1) of negligence on the defendant's part, and (2) of a causal relationship between the negligence and the plaintiff's injuries." *Civitarese* v. *Gorney*, 358 Mass. 652, 655 (1971). The defendants claim that the evidence presented at trial was insufficient to support a verdict either that the defendants were negligent, or that the actions of the defendants proximately caused the plaintiff's injuries. We disagree.

The test for determining whether the jury could have found that the defendants were negligent is whether the evidence, construed most favorably to the plaintiff, could not support a verdict for the plaintiff. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). We must determine whether anywhere in the evidence, from whatever source derived, can be found any combination of circumstances in favor of the plaintiff. *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

The jury could have believed from the expert testimony that Dr. Chin, during his meeting with the plaintiff, deviated from good medical practice in the following ways. When faced with a patient complaining of the plaintiff's symptoms, Dr. Chin should have taken a more detailed medical history, inquiring about visual problems, sensory motor deficits, numbness, tingling, and whether the pain radiated. Dr. Chin should have conducted a more extensive neurological examination, beyond the rudimentary examination that he performed. Most importantly, Dr. Chin should have told the plaintiff to return in two to three days if the pain continued.[3] Thus, the record supports

---

[3] The defendants argue that the plaintiff's claim of malpractice in fact is a claim that Dr. Chin failed to comply with his obligations under the informed consent doctrine. The informed consent doctrine, however, is inapplicable to the case at hand. That doctrine concerns the failure of a physician "to divulge in a reasonable manner to a competent adult patient sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure. . . ." *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass. 152, 154-155 (1982). Although the plaintiff's complaint alleged such lack of informed consent, the case was not tried on that theory but on the theory that Dr. Chin was negligent as discussed above.

the finding that Dr. Chin was negligent in his examination of the plaintiff, in his failure to explore other possible diagnoses, and in his failure to give the plaintiff warnings and explanations adequate for follow-up care.

2. *Causation.* A plaintiff in a medical malpractice action has the burden of proving that the physician's negligence was the proximate cause of the plaintiff's injuries. *Murphy* v. *Conway*, 360 Mass. 746, 749 (1972). *Semerjian* v. *Stetson*, 284 Mass. 510, 512 (1933). This causal link generally must be established by expert testimony that the injury was more probably than not a result of the physician's negligence. See *Berardi* v. *Menicks*, 340 Mass. 396, 402 (1960). The question of causation is generally a question of fact for the jury. *Mullins* v. *Pine Manor College*, 389 Mass. 47, 58 (1983). *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 327 (1973). "To withstand a motion for a directed verdict on the issue of proximate causation, the plaintiff need only demonstrate that there was a greater likelihood that the harm of which the plaintiff complains was due to causes for which the defendant was responsible." *Colter* v. *Barber-Greene Co.*, 403 Mass. 50, 54-55 (1988).

The plaintiff argues that if Dr. Chin had not acted negligently, but instead had told the plaintiff about other possible diagnoses and had told the plaintiff to return if the pain continued, the plaintiff would have had an excellent chance of avoiding his quadriplegia. The defendants assert that the evidence on causation was insufficient and the plaintiff's case therefore should not have gone to the jury. We conclude that there was sufficient evidence on the issue of causation.

The plaintiff has met the burden of proving that the defendants' negligence caused the harm he actually suffered. As we concluded above, the plaintiff met his burden of proving negligence by showing that the defendants failed to exercise due care in rendering medical care, a service which was necessary for the plaintiff's protection. See *Mullins* v. *Pine Manor College, supra* at 53. The plaintiff's expert stated at trial that Dr. Chin should have told the plaintiff to return within three days if the pain continued. The law permits an inference that a warning, once given, would have been followed. *Wolfe* v.

*Ford Motor Co.*, 6 Mass. App. Ct. 346, 352 (1978). Thus, the jury could conclude that the plaintiff would have returned to the emergency room within three days.

One of the plaintiff's experts further stated that once the plaintiff returned to the emergency room, proper medical procedure would have required that medical practitioners treat the plaintiff with the following care.[4] The medical practitioners would have the plaintiff undergo X-rays, which they would then read immediately. No fracture, dislocation or tumor having been found, they would have the plaintiff undergo a CAT scan. In light of the plaintiff's symptoms at the time, the CAT scan would have been positive, showing a bulge or herniated disc. They would have immobilized and observed the plaintiff, and barring any change, would have operated on him earlier. Early surgical intervention would probably have been successful in preventing quadriplegia.

3. *Closing arguments.* Both the plaintiff and defendants raise numerous objections to the closing arguments of the opposing side. The defendants argue that the improprieties in plaintiff's counsel's argument make a new trial necessary. We agree that the argument by plaintiff's counsel was egregious and "improper under long established, and well understood, principles." *Leone* v. *Doran*, 363 Mass. 1, 18 (1973). We conclude, however, that the strong, corrective action taken by the judge in response to counsel's improper argument eliminates the need for a new trial.[5]

---

[4] Dr. Gary Korenman, the plaintiff's expert in neurology, was asked by the plaintiff's counsel about his opinion "as to what medical care would have been required for Mr. Harlow if he had returned within seventy-two hours of having been discharged [from the emergency room]." Dr. Korenman's answer began: "The appropriate medical care at that point. . . ." Later in his answer, the expert used the words, "I would have ordered a CAT scan." Although the expert used the word, "I," it is clear from the context that he was still discussing the "appropriate medical care" which would have been required had Harlow returned to the emergency room.

[5] The defendants did not object to this instruction as inadequate. "[W]e ordinarily insist on exceptions with respect to any inadequacies in curative instructions." *Commonwealth* v. *Gouveia*, 371 Mass. 566, 572 (1976). See also *Commonwealth* v. *Cabot*, 241 Mass. 131, 151 (1922). The defendants did not make any objections to the judge's curative instructions in connection

In his argument, plaintiff's counsel referred by way of anal-
ogy to the verdict in the *Texaco* case (*Texaco, Inc.* v. *Pennzoil,
Co.,* 729 S.W.2d 768 [Tex. Civ. App.] [1987], cert. dismissed,
485 U.S. 994 [1988]), the "two or three hundred thousand
dollars" for one minute of advertising time during the Super-
bowl, the "a million four" for baseball players' salaries, the
"ten million dollars, or twenty-five million dollars" for a
crashed airplane, and the "five million dollars" for paintings
by Renoir and Monet. An argument concerning money damages
indulging in significant references to numerical amounts that
have no basis in the record is improper. See *Gardner* v. *State
Taxi, Inc.,* 336 Mass. 28, 30 (1957). Repeated, substantive
discussions of hypothetical damages in other circumstances,
and especially references to verdicts in other cases, are not
proper. See *Dotson* v. *Sears, Roebuck & Co.,* 157 Ill. App.
3d 1036 (1987); *Reetz* v. *Kinsman Marine Transit Co.,* 416
Mich. 97, 105-106 (1982). See also S.J.C. Rule 3:07, DR7-106
(1), 382 Mass. 784 (1981). Such arguments are especially
overreaching in a case in which the plaintiff is a quadriplegic
for life.

In response to the objections, the judge extensively discussed
with counsel for both sides the substance of a proper curative
instruction.[6] The judge informed counsel that he thought an

---

with damages. Nevertheless, we think the defendants preserved their objec-
tions. The defendants' objections to the arguments on damages came at the
end of their long list of objections. Almost immediately afterward, defense
counsel said, "I've never heard an argument like that, and I hope I never
hear one like it." As we read the record, the juxtaposition of this statement
with the objection on the arguments concerning damages, in addition to the
seriousness of the improprieties inherent in these arguments, put the judge
on notice that vigorous action was required. We conclude that the judge
took such action.

Although the defendants could have and should have requested specific
curative action from the judge regarding the plaintiff's counsel's improper
arguments because the judge deliberated with counsel at length about the proper
curative instruction he ought to make, *Commonwealth* v. *Cabot,* 241 Mass.
131, 151 (1922); see also *Collins* v. *Baron,* 392 Mass. 565, 568 n.3 (1984),
we conclude that counsel's statement in these circumstances was sufficient.

[6] Defense counsel also is accused on appeal of improprieties in his closing
arguments. The plaintiff complains that defense counsel argued improperly
in the following ways: defense counsel referred to the plaintiff's drinking

instruction on the nature and status of closing arguments, in addition to his previous instructions that the words of counsel were not evidence, would be sufficient to take care of any impropriety. Soon afterward, the judge said, "Okay. I'm going to tell the jury that the closing arguments are not evidence. I've told them over and over again. I'll try to cure it as best I can." At that point, counsel for the defendants answered, "Thank you, Your Honor." Defense counsel went on to tell the judge that "the only other thing" that he requested was specific instructions on the impropriety of first person statements by counsel[7] and instructions on the impropriety of reading from a transcript.[8] Thus, the judge adopted the suggestions of defense counsel relating to those two issues. The defendants also asked the judge to admonish plaintiff's counsel before the jury and instruct the jurors as to the impropriety of the argument. Defense counsel recognized that the remedy was a matter within the judge's discretion because he left it to the judge "whether [he] want[ed] to do that or not." The judge cautioned the jury that the argument was not evidence.[9] The judge in-

---

a few beers as a possible cause of the injury, although defense counsel admitted that the drinking did not have anything to do with the case; defense counsel misrepresented the plaintiff's testimony by stating that the plaintiff said his pain went away after the initial accident but before the onset of quadriplegia; defense counsel improperly referred to Dr. Chin's repudiated testimony, arguing to the jury that Dr. Chin had warned the defendant to come back if he did not feel better. See note 11, *infra*. Finally, defense counsel referred to a second cervical collar other than the one put on Harlow on March 5, implying that Harlow might have seen another health care provider. There was no evidence of a second cervical collar and no evidence that Harlow had seen a second health care provider. These arguments are not grounded in the evidence and also were improper.

[7] The judge instructed the jurors that any "first person comments of counsel are to be regarded as their own opinions and not as evidence."

[8] The judge told the jurors that reading from the transcript represented "information which purportedly comes from some of the oral evidence in the case. These readings and information are not evidence."

[9] The judge instructed the jury: "Sometimes in our zeal we get carried away. Sometimes lawyers say things which on quiet reflection later on they may decide they should have said differently. . . . I've said to you earlier, and I said to you again a little while ago that the statements of the attorneys,

structed the jurors on damages comprehensively and correctly. The defendants did not object to the instructions on damages.[10] The trial judge did not abuse his discretion in the manner in which he handled the alleged improper statements and arguments. See *Fialkow* v. *DeVoe Motors, Inc.*, 359 Mass. 569, 572 (1971).

We again comment that if a judge fails to cure an alleged error, the judge is "entitled at the end of the charge to have errors and omissions claimed to exist therein brought to his attention, and if an exception was desired because of such omission or error to have the exception taken for such reason or reasons." *Commonwealth* v. *Cabot*, 241 Mass. 131, 151 (1922). See *Commonwealth* v. *Gouveia*, 371 Mass. 566, 572 (1976); Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974).

4. *Comparative negligence.* The plaintiff asserts that defense counsel's improper remarks are the basis for the jury's determination of thirteen per cent negligence by the plaintiff. He therefore asks that we reinstate the thirteen per cent to the verdict. For the reasons stated below, we decline to do so.

In the light most favorable to the defendants, the jury could have found that Dr. Chin informed the plaintiff to return to the emergency room if the pain got worse.[11] The plaintiff claims

---

the lawyers, at the end of the case, are not to be regarded as evidence. . . . They're not to be used as evidence. They're not to be dealt with as evidence. And, if some of the remarks came across to you in a way that seemed like they should be considered by you, you mustn't do that. You mustn't consider them as evidence. I can't stress that point enough. . . . If an attorney has expressed his opinion on something, that's his opinion and nothing more. The facts in this case are to be decided by you and nobody else — not by me; not by the lawyers." The judge previously instructed the jury at least three other times that the statements of counsel were not evidence.

[10] In the course of his instructions on damages, the judge told the jury that, if they reached damages, they were to base an award strictly on a compensatory basis. And that, as to pain and suffering, the jurors were to act "fairly, reasonably, without bias or prejudice, without sympathy," or not to act "punitively" because it was not their function "to punish anybody."

[11] Dr. Chin also testified on direct examination that he told the plaintiff to come back if the pain did not get better. The plaintiff correctly notes, however, that Dr. Chin repudiated this testimony during cross-examination,

that the record contains no evidence that the plaintiff's pain got worse from February 11, 1982, the day of his examination by Dr. Chin, until March 5, 1982, the day he returned to the hospital. Thus, the plaintiff argues that the record contains no evidence that he disobeyed the doctor's orders, and he therefore cannot be found negligent. The plaintiff argues that it was defense counsel's improper arguments which misled the jury. The issue is close. We turn to the record.[12]

On cross-examination, the following colloquy took place between the plaintiff and defense counsel:

Q.: "It's your testimony today that [the pain] never went away, and got worse and worse until you finally went back on March 5th? Is that correct?"

A.: "That's right. The pain never left."

---

electing to stand by his deposition testimony. When a witness not only makes conflicting statements at trial but specifically repudiates part of his testimony, the jury may not believe the repudiated testimony. *Sullivan* v. *Boston Elev. Ry.*, 224 Mass. 405, 406 (1916). P.J. Liacos, Massachusetts Evidence 143 (5th ed. 1981). The defendants do not argue with the proposition that Dr. Chin elected to stand by his deposition testimony that he told the plaintiff to come back if the pain got worse, not if it failed to get better.

[12] On redirect examination, the plaintiff testified about whether the pain had worsened. The transcript of the plaintiff's testimony is unclear. Plaintiff's counsel in his examination of the plaintiff elicited the following testimony:

Q.: "Was [your condition] getting worse day by day up until [March 5, 1982,] or had you had some improvement?"
A.: "No. It was worse."
Q.: "Worse on that day?"
A.: "It wasn't improving at all."
Q.: "It was staying the same. It improved to the degree that when you came off the Flexeril you had worsened?"
A.: "That's right. I still had the pain."
Q.: "You didn't get worse?"
A.: "Yes."
Q.: "The day it got worse was the day you had the problem with your leg, pain in your leg?"
A.: "Yes."
Q.: "That's the day you went back to Chelsea?"
A.: "Yes."

In any event, the exchange during cross-examination which we discuss *infra* provides sufficient evidence to support the finding.

The plaintiff argues that the question was a compound question, and that his answer referred only to the question about whether the pain ever left. But a reasonable jury could interpret the statement another way and conclude that the plaintiff agreed the pain got worse.

Because the jury could have found that Dr. Chin warned the plaintiff to return to the emergency room if his pain got worse, and the plaintiff did not return even though his pain intensified, the verdict of thirteen per cent comparative negligence is based on sufficient evidence.

5. *Reductions pursuant to the medical malpractice statute.* The defendants call upon us to interpret a new provision of the medical malpractice statute, G. L. c. 231, § 60G, for the first time. This section allows the trial judge to deduct from the damage award the amount received by the plaintiff from collateral sources.[13] The provision in question became effective while the jury in this case was deliberating. The plaintiff does not argue that the statute does not apply to cases on trial at the time the statute became effective.

---

[13] In relevant part, G. L. c. 231, § 60G, provides: "(*a*) In every action for malpractice, negligence, error, omission, mistake . . . in which the plaintiff seeks to recover for the costs of medical care, custodial care or rehabilitation services, loss of earnings or other economic loss . . . on motion by a defendant or upon its own motion, the court shall hear evidence of any amount of such damages incurred prior to the judgment which the defendant or defendants claim was replaced, compensated or indemnified pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act . . . or any other collateral source of benefits whatsoever, except for gratuitous payments or gifts. If the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount the plaintiff himself paid or contributed to secure his right to the benefits concerning which the defendant has introduced evidence.

"(*b*) If the court finds that any such cost or expense was replaced, compensated, or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums or other amounts paid by the plaintiff for such benefits for the one-year period immediately preceding the accrual of such action.

"(*c*) Notwithstanding the provisions of section seventy A of chapter one hundred and eleven, no entity which is the source of the collateral benefits by which the court has reduced the award to the plaintiff hereunder shall recover any amount against the plaintiff, nor shall it be subrogated to the rights of the

In response to postjudgment interrogatories propounded by the defendants, the plaintiff listed the following collateral sources as those which compensated him for damages which he had alleged in his complaint: Medicare ($7,304.35); United States Department of Housing and Urban Development (no amount specified); Medicaid ($159,225.35); Boston Center for Independent Living, a Medicaid-funded program ($50,547); and Social Security Disability and Supplemental Social Security ($473 per month, no period specified).

On January 16, 1987, the judge ruled that the new provisions of the statute do "not require the reduction of the verdict by the amount Mr. Harlow has received from the state and federal governments." The judge erred and failed to apply the statute properly. Because the defendants may be entitled under G. L. c. 231, § 60G, to some deduction from the jury award, we remand to the trial court for proceedings adhering to the guidelines we now discuss.

To ensure proper application of the statute, we must examine separately each benefit enumerated by the plaintiff in his answer to the defendant's interrogatories. We must determine whether the benefits are governed by G. L. c. 231, § 60G, or whether they are exempted from its provisions because they entail a right of subrogation with a "basis in any Federal law." G. L. c. 231, § 60G (c).

The statute applies to the amount of prejudgment damages which were "replaced, compensated, or indemnified pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act . . . or any other collateral source of benefits whatsoever, except for gratuitous payments or gifts." G. L. c. 231, § 60G (a). In those cases where these benefits duplicate the damages awarded, the judge

plaintiff against the defendant, nor shall it have a lien against the plaintiff's judgment, on account of its payment of the benefits by which the court has reduced the amount of the plaintiff's judgment; provided that, if the plaintiff has received compensation or indemnification from any collateral source whose right of subrogation is based in any federal law, the court shall not reduce the award by the amounts received prior to judgment from such collateral source and such amounts may be recovered in accordance with such federal law. . . ."

shall reduce the award by the amount of the benefits, less the amount the plaintiff paid to secure such benefits, through premiums and the like. G. L. c. 231, § 60G (*b*).

The provision is designed to prevent double recovery by a plaintiff through litigation. It also protects the plaintiff from double loss of benefits by cancelling the rights of subrogation and perfections of lien previously held by the entities which provided these collateral benefits. G. L. c. 231, § 60G (*c*). Thus, when the judge deducts the benefits from the damage award, the entity which provided the benefit cannot collect that amount from the plaintiff.

There is an exception, however, for benefits provided by an entity "whose right of subrogation is based in any federal law." In those cases, the right of subrogation survives, and the court may not deduct those amounts from the damage award. *Id.*

The defendants admit that the plaintiff's Medicare benefits are not subject to G. L. c. 231, § 60G, because the Federal statute establishing the Medicare benefits also establishes a Federal right of subrogation. 42 U.S.C. § 1395y(b)(1) (1982).[14]

A more difficult issue is presented with regard to Medicaid benefits. The Federal government reimburses the Commonwealth a percentage of the cost of the Medicaid program. A Federal statute requires that States receiving Federal funds must pursue recovery of the funds from legally liable, third parties. 42 U.S.C. § 1396a(25) (1982).[15] A Federal regulation requires the State to reimburse the Federal government a pro-

---

[14] The defendants also do not challenge the Housing and Urban Development benefits, apparently because of insufficient information. An "appellate court need not pass upon questions or issues not argued in the brief." Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[15] The Federal statute, 42 U.S.C. § 1396a(25) (1982), requires a State plan to provide that "in any case where . . . legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek the reimbursement for such assistance to the extent of such legal liability."

portion of such recovery.[16] A State statute duly provides for recovery from third parties and subrogation of the plaintiff's claim. G. L. c. 18, § 5G.[17]

The defendants argue with regard to Medicaid benefits that there is no right of subrogation "based in any federal law" within the meaning of G. L. c. 231, § 60G (*c*). We disagree. The Federal statute implementing partial reimbursement of State Medicaid programs mandates that any State receiving these funds must pursue reimbursement from legally liable third parties. The fact that technically a State statute provides for the subrogation is irrelevant. Because the Commonwealth's pursuit of reimbursement is required by Federal law, the right of subrogation is "based in" Federal law.

The choice of language contained in G. L. c. 231, § 60G (*c*), and the objective of this exception, support our reading. The Legislature chose to use the expansive term "based in any federal law" rather than the more stringent "required by federal law" or "provided for by federal law." A provision that a State receiving Federal money must pursue reimbursement suffices to make the consequent right of subrogation "based in" Federal law. The objective of the exception is to prevent conflicts between G. L. c. 231, § 60G, and any Federal law, which of course must be supreme. U.S. Const. art. VI, § 2. The Legislature clearly attempted to avoid conflicts with Federal· law, and we also read the statute to avoid any conflict with Federal law.

The defendants further argue that if Medicaid payments are excepted from the rule of G. L. c. 231, § 60G, only the per-

---

[16] The Federal regulation, 42 C.F.R. § 433.140(c) (1989), provides that, if the State receives the third-party reimbursement, "the State must pay the Federal Government a portion of the reimbursement determined in accordance with the [Federal medical assistance percentage] for the State."

[17] The State statute, G. L. c. 18, § 5G (1988 ed.), provides: "When any claimant receives payment from a . . . third party, the claimant shall repay to the department an amount equal to the benefits provided . . . but only to the extent that such benefits were provided as a result of the property damage, accident, illness, injury, or other loss suffered by the claimant. . . .

"The Commonwealth shall be subrogated to a claimant's entire cause of action or right to proceed against any third party. . . ."

centage which is ultimately reimbursed to the Federal government should be excepted. Again, we disagree. The statute mandating that the States pursue reimbursement of Medicaid funds makes no distinction between pursuit of funds which will ultimately be reimbursed and those which the State will retain. See 42 U.S.C. § 1396a(25). If the Commonwealth was allowed to recover from a third party only the percentage of Medicaid funds reimbursable to the Federal government, and have its rights to the other percentage cancelled by G. L. c. 231, § 60G, the incentives to recover, as provided by Federal law, also would lessen significantly. The right of subrogation as to all Medicaid benefits survives G. L. c. 231, § 60G, and thus Medicaid benefits are not deductible from the jury award.

The benefits received from Social Security, however, may be subject to the provisions of G. L. c. 231, § 60G. Neither party has pointed to a Federal right of subrogation in relation to the grant of Social Security benefits, and we have not been able to discern one. If the judge determines that there is no Federal right of subrogation with respect to such benefits, and that the Social Security benefits received by the plaintiff duplicate part of the jury verdict, he shall reduce the jury verdict by that amount. To allow for this determination, and for the determination of the amount of prejudgment Social Security benefits received by the plaintiff, we remand the case to the Superior Court.

6. *Other issues.* The defendants make a number of other arguments on appeal.

a. *Jury instructions.* The defendants complain that the trial judge committed reversible error when he gave his jury instruction on warnings and negligence.[18] They complain that the

---

[18] The judge informed the jury that "[t]he law presumes that a warning if given will be heeded." The judge continued to describe the warning he meant in the context of this case; this section seems to be the basis of the defendants' complaint: "An adequate warning is by definition one that would in the ordinary course have brought to the plaintiff's attention the dangers and consequences which he might suffer. The warning in this case could be a warning given to Mr. Harlow as to the dangers if he didn't return to the Chelsea Unit of the Massachusetts General Hospital if his symptoms continued. The failure to give such a warning therefore permits the inference

instruction essentially mandated a jury finding that Dr. Chin breached a duty in not warning the plaintiff at the examination about possible dangers.

There was no error. The judge simply informed the jury that, in establishing the causal chain, the plaintiff is entitled to the presumption that, had he been given a warning, he would have returned. That is a correct statement of the law. *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 493 (1983). *Wolfe* v. *Ford Motor Co.*, 6 Mass. App. Ct. 346, 352 (1978). The language of the judge's instruction in no way mandates a finding that Dr. Chin needed to issue a warning to the plaintiff. In any event, prior to the instruction at issue, the judge instructed the jury that the question whether any warning should have been given was for them to decide.[19]

b. *Life expectancy*. The medical malpractice statute, G. L. c. 231, § 60F (1988 ed.), requires a jury to specify the amount of time over which an award for future medical expense and future pain and suffering is meant to compensate the plaintiff. The jury specified thirty-one and one-half years of compensation. At trial, the plaintiff's expert opined that, according to mortality tables, a white male of Harlow's age has a future life expectancy of thirty-one and one-half years. On cross-examination, the expert admitted that a quadriplegic's life expectancy generally is shorter than that of an average man.[20]

The defendants argue that there was insufficient evidence to support a finding of thirty-one and one-half years, because the plaintiff's expert admitted that generally the life expectancy

_____

. . . that if the warning were given it would have alerted the plaintiff to the danger of his present medical condition and he would have returned for medical care if his symptoms continued." In response to a question from the jury, the judge gave this instruction a second time, changing the word "could" in the second sentence to "would." In the context of the charge read as a whole, we do not regard this change as significant.

[19] "Next, with respect to the matter of warnings, the question of whether a warning to Mr. Harlow by Dr. Chin should have been given is for the jury to decide on, to decide on the basis of the evidence before you. It's for you to decide that question, whether any warning should have been given."

[20] We note, however, that the plaintiff's expert did not testify on direct or cross-examination that the plaintiff himself had a shorter life expectancy.

of a quadriplegic was shorter. We do not agree with the defendant's contention.

Expert testimony based on mortality tables is admissible to prove the probable duration of a person's life. *Turcotte* v. *DeWitt*, 332 Mass. 160, 162-164 (1955). Mortality tables, though not conclusive proof of life expectancy, help furnish a basis for the jury's estimation. The tables themselves are admissible regardless of the poor health or extra-hazardous occupation of the person whose life expectancy is being estimated. *Levar* v. *Elkins*, 604 P.2d 602, 604 (Alaska 1980). *Bell Aerospace Corp*. v. *Anderson*, 478 S.W.2d 191 (Tex. Civ. App. 1972). When the opposing side believes that the person in question, because of poor health, has a lower life expectancy than that reflected in the mortality tables, the usual remedy is to offer evidence to that effect and argue the point to the jury. *Nolop* v. *Skemp*, 7 Wis. 2d 462, 465 (1959).

The jury had the full benefit of the defendants' cross-examination of the plaintiff's expert concerning the shorter life expectancy of quadriplegics. The jury was able to consider not only the expert testimony based on the mortality tables, but all the evidence in this case, including testimony concerning the plaintiff's excellent physical condition before the accident. The jurors themselves were able to observe the plaintiff when he testified. We cannot say that the jury's award was based on insufficient evidence.

c. *Expert testimony*. The defendants argue that the judge erred in allowing Dr. Harold Goldstein, the plaintiff's expert on medical economics, to testify as to future medical expenses. "[E]xpert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision." *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982). Dr. Goldstein was qualified at trial without objection as an expert in the field of medical economics, which concerns costs of medical care and efficient allocation of medical resources. Dr. Goldstein has prepared "perhaps a hundred" reports dealing with medical economics issues concerning patients with quadriplegia and paraplegia. He has prepared a computerized program to determine costs necessitated by those conditions. There

is no merit to the defendants' argument that Dr. Goldstein was outside his area of expertise in testifying about the plaintiff's future medical costs.

There is similarly no merit to the contention that Dr. Goldstein impermissibly commented about the testimony of another one of the plaintiff's experts, Dr. Murray Freed, when he compared his figures with Dr. Freed's. Dr. Goldstein was merely testifying in his area of expertise, and not invading the province of the jury with respect to Dr. Freed's testimony. Cf. *Simon* v. *Solomon, supra.*

d. *Charitable immunity.* The hospital argues that any judgment entered against it should be limited to twenty thousand dollars, pursuant to the charitable organization statute, G. L. c. 231, § 85K (1988 ed.).[21] See note 2, *supra.* In order to enjoy the statutory cap, a hospital must prove both that it is a charitable organization, and that the tort complained of "was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation." G. L. c. 231, § 85K (1988 ed.). If a hospital's objective in treating a patient, however, is merely to generate revenue, the hospital's activity must be analyzed as "commercial" rather than "charitable." See *Grueninger* v. *President & Fellows of Harvard College,* 343 Mass. 338, 340 (1961). In its answer to the plaintiff's complaint, the hospital pleaded charitable immunity under G. L. c. 231, § 85K, as an affirmative defense. The hospital also admitted the allegation in the plaintiff's amended complaint that the hospital "is a charitable institution and a health care provider." The hospital was incorporated by St. 1810, c. 94, "to provide a general hospital for sick and insane persons." *McDonald* v. *Massachusetts General Hosp.,* 120 Mass. 432, 434 (1876).

Thus, the hospital is clearly a charitable organization. Further, there was ample evidence from which the judge should have concluded that, in treating the plaintiff, the hospital's clinic was acting to accomplish directly the charitable purpose

---

[21] The plaintiff does not argue that the $20,000 statutory limit on damages is invalid.

for which the hospital was created. The clinic ran an emergency room that was open to the public. The clinic provided medical services to the plaintiff, as evidenced by his medical record. The hospital charged the plaintiff only $26. The judge, however, did not make a specific ruling concerning the applicability of the statutory cap to the case before him.

Although the hospital should have brought the matter to the judge's attention, we conclude that the plaintiff's counsel brought the issue before the judge.[22] This, in addition to the pleadings, and the evidence concerning the clinic, should have put the judge on notice.

The hospital met its burden of showing that the tort was committed in the course of its charitable purpose. The plaintiff produced no other evidence tending to show that the hospital was acting outside of its charitable purpose, except the fact that he was charged a fee of $26. The fact that a fee was charged, however, is not sufficient to take the hospital out of the protection of G. L. c. 231, § 85K. In the absence of any further evidence tending to show that the hospital was acting outside its charitable purpose, and in light of the plaintiff's acknowledgment at trial of the applicability of the statutory cap, see note 21, *supra,* we conclude that the judge should have entered judgment against the hospital limited by the statutory cap.

We affirm the Superior Court judge's denial of the defendants' motion for a directed verdict, judgment notwithstanding the verdict, and for a new trial. We also affirm the judge's denial of the plaintiff's motions to reinstate thirteen per cent to the jury's award. We remand the case to the Superior Court

---

[22] Before the case was submitted to the jury, the plaintiff made a motion to remove the hospital from the case if the judge would not accept the plaintiff's jury question on respondeat superior. The plaintiff stated, "[A]s the Court is well aware there's a twenty thousand dollar cap on a verdict against a charitable institution, namely, the Massachusetts General Hospital." He later stated that any verdict against the hospital "is only collectible to the amount of twenty thousand dollars." Finally, he stated that a verdict against the hospital alone would open up the possibility of a "draconian result" occurring: that the plaintiff would "only be[ ] able to collect twenty thousand dollars" from the hospital.

for entry of a judgment against the hospital limited to the statutory cap of G. L. c. 231, § 85K, and to subtract from the award against Dr. Chin any prejudgment Social Security benefits which are required to be deducted pursuant to G. L. c. 231, § 60G.

*So ordered.*


LYNCH, J. (dissenting, with whom Nolan, J., joins). Apart from the dissenting opinion of Justice O'Connor, with which I agree, I would remand the case to the Superior Court for a new trial because of the improper argument of the plaintiff's counsel. At the outset, I point out that the plaintiff's improper remarks were not limited to the issue of damages. In addition to alluding to numerous significant monetary amounts without any basis in the record, the plaintiff's counsel made the following remarks: "[M]uch of the evidence that [defendants' counsel] said was in this case is not, and I think he knows it." He then accused defendants' counsel of intentionally making arguments to "stink the case up" because the defendants "don't have a defense." He went on to characterize the defendants' arguments as "ridiculous," "incredible," and "a bunch of baloney." He accused the defendants of "filling in memories that didn't exist" and "winging it" with respect to their defense. He announced that Chin's predictable prevarication required a trial strategy of laying "a few traps" for him and "swinging them."

The plaintiff's counsel then portrayed himself as the plaintiff's hardworking advocate who had been "working on this case for four years" and "put a lot of work into this case." He also asserted that he had refrained from introducing evidence that might embarrass the plaintiff; he made representations to the contents of a trial transcript, not in evidence, and asserted that defense counsel had misrepresented the testimony contained therein; he described a trust fund not in evidence as the repository of any damages to be awarded to his client; he made assertions as to the plaintiff's potential marriageability; and he suggested that a finding of liability would vindicate the rights of

the residents of Chelsea to receive the same medical care as the residents of Boston.[1]

During the course of the argument the defendants made two objections and received rather innocuous responses from the judge. That is, the judge gave the jury an instruction but did not warn or admonish counsel or otherwise direct that the improper remarks should cease. At the close of the argument defense counsel registered an additional twenty-six specific objections. During the course of these objections, the judge's comments were more or less favorable or, again, innocuous. The defendants' counsel requested curative action. The judge responded: "I think that the instructions the Court has already given and will also give to the jury about the nature and status of closing arguments and summations will be sufficient to take care of the problem, I hope. I'll say no more than that." This falls far short of "strong corrective action" that the court concedes was required in the face of egregious and improper argument of the plaintiff's counsel. *Ante* at 703. Defense counsel then asked that the jury be told that any first-person comments by opposing counsel not only should be disregarded, but also were improper. The judge responded by saying that he would tell the jury that closing arguments are not evidence. Defense counsel then pressed the judge further for an instruction that the argument was improper. That request was again refused. Finally defense counsel requested that opposing counsel be admonished for making personal, first-person opinions and observations and for reading from a transcript, not in evidence, and saying that there was nothing in it. The ensuing discussion and the abrupt adjournment for lunch fairly demonstrate the judge's refusal to grant the request to admonish the plaintiff's counsel and to inform the jury that the argument was improper. While the judge informed defense counsel that — "even if you do object" — he would instruct the jury that first-person comments in argument are not "proper comment on the evidence," he expressly and repeatedly refused either to instruct that it was *improper* for counsel so to argue, or to admonish the plaintiff's counsel on the record and before the jury.

---

[1] One of the jurors was from Chelsea.

After the judge's charge to the jury there was an extended bench conference concerning specific requests for instruction filed by both parties. None of this discussion concerns the defendants' objections to the plaintiff's argument, and I submit that, in the face of the precharge conference during which the judge clearly indicated he was unwilling to admonish the plaintiff for improper argument, no additional request or objection was required. See *Heina* v. *Broadway Fruit Mkt, Inc.*, 304 Mass. 608, 611 (1939).

I do not accept the court's view that the judge adopted the suggestions of defense counsel regarding curative instructions. In the context of the colloquy discussed above, defense counsel's comments cannot be regarded as assent or agreement. This is so for two reasons: First because the only "strong corrective action" open to the judge, admonishment of the plaintiff's counsel in the presence of the jury, which was clearly requested by the defendants' attorney, was just as clearly refused by the judge. Second, I suggest that sufficient precedent exists in cases where this court was dealing with the problem of improper argument to send the case back even where the judge's instructions were accepted without objection. See *Goldstein* v. *Gontarz*, 364 Mass. 800, 811-812 (1974) ("[n]or do we think the defendants were required to apply for a corrective instruction after the judge had twice ruled flatly against them"), and cases cited. Here we have a situation where it is opposing counsel's conduct which is the subject of the objection, conduct that occurs in front of the jury, in a context where it is difficult to object, and where limited opportunities for corrective action exist. I would submit in such situations, where the only feasible corrective action has been plainly and persistently requested and denied by the trial judge, there has been no acquiescence by defense counsel and no further objection is required.

Failure to object at the close of the charge is not fatal in these circumstances. *London* v. *Bay State St. Ry.*, 231 Mass. 480, 486 (1919). In *Leone* v. *Doran*, 363 Mass. 1 (1973), the court commented on trial tactics intended to impress on the jury facts that were not warranted by the evidence. A new trial

was ordered where the argument was improper and where the judge declined to take rigorous and emphatic corrective action. Although the conduct of counsel in this case was not as egregious as counsel's conduct in *Leone*, I think it is nevertheless true that counsel's "tactics do a disservice to the court, the public, and the litigants." *Id.* at 19. In a similar situation, but under the much more restrictive rules of practice in use at the time, the court ruled that, once the trial judge had made a final ruling on an objection to an opponent's final argument, that ended the incident as far as objecting counsel was concerned. "The circumstance that at the close of the charge no further exception was taken did not deprive the defendants of whatever value there was in the exception previously taken to a definitive ruling." *Doherty* v. *Levine*, 278 Mass. 418, 420 (1932).

I therefore believe that, to require counsel in this case to do more is contrary to precedent and unfair, rewards egregious behavior, and does a disservice to the court, the public, and litigants.


O'CONNOR, J. (dissenting, with whom Nolan and Lynch, JJ., join). I agree that the jury would have been warranted in finding that Dr. Chin failed to advise Harlow to return to Chelsea Memorial Health Care Center in seventy-two hours if his pain persisted and that that failure constituted negligence. I do not agree, however, despite the sympathetic appeal of the plaintiff's situation, that the jury were warranted in finding that that negligence caused Harlow's quadriplegia.

Harlow had the burden of proving causation. The jury reasonably could have found that, had Harlow been properly advised, he would have returned to the health care center in seventy-two hours. The critical question on appeal bearing on causation is whether there was evidence to support a finding within the realm of probability that, had Harlow returned in seventy-two hours, his condition would have been diagnosed and treated and quadriplegia prevented.

The court says, *ante* at 703, that "[o]ne of the plaintiff's experts . . . stated that once the plaintiff returned to the emer-

gency room, proper medical procedure would have required that medical practitioners treat the plaintiff" by, among other things, subjecting him to a CAT scan, which would have shown "a bulge or herniated disc," which, in turn, would have led to early and successful surgery. In his argument on appeal, Harlow relies exclusively on the testimony of Dr. Gary Korenman, a New York City neurologist, as to the causation issue. That Harlow would have been subjected to a CAT scan is critical to his case because there is no evidence that, in the absence of a CAT scan, the seriousness of Harlow's condition would have been recognized or that surgery would have been performed. Only Dr. Korenman testified about a CAT scan. Therefore, if the court is to be true to its responsibility to decide whether the plaintiff produced sufficient evidence, and to explain its decision, mere characterization of the critical testimony or paraphrasing of it is not enough. Close scrutiny of the relevant questions and answers as they appear in the record is necessary.

The relevant questions put to Dr. Korenman and his answers are as follows:

Q.: "Doctor, do you have an opinion based on reasonable medical certainty as to what medical care would have been required for Mr. Harlow if he had returned within seventy-two hours of having been discharged from Chelsea Memorial Health Care Clinic consistent with the Door Sheet, Plaintiff's Exhibit No. 1, on 2-15-82?"

A.: "Yes, I do."

Q.: "What is that opinion, Doctor?"

. . .

A.: "The appropriate medical care at that point, seventy-two hours subsequent to 2-15-82, with the persistence of symptoms, would have been a re-taking of the history, a thorough neurologic and general physical examination, and ordering cervical spine X-rays, with a wet reading — that is, wet reading means that the X-rays are read immediately, or as an emergent procedure. Depending upon what the results of those X-rays were at that point, assuming that there was no fracture, no dislocation, no tumor, that the X-rays were within normal limits

with his symptoms persisting, I would have ordered a CAT scan at that point."

There was no evidence that, in the circumstances of this case, it was routine procedure at Chelsea Memorial Health Care Center to order or perform a CAT scan. I would agree, though, that had evidence been introduced that physicians of average competence would have ordered a CAT scan in the circumstances of this case, such evidence would have been adequate to support a finding that a CAT scan would have been ordered upon Harlow's prompt return to the center. See Brune v. Belinkoff, 354 Mass. 102, 109 (1968). But, no such evidence was introduced.

Harlow's counsel asked Dr. Korenman his opinion "as to what medical care would have been required for Mr. Harlow if he had returned within seventy-two hours of having been discharged from Chelsea Memorial Health Care Clinic?" The witness answered that "appropriate medical care" would have involved certain specified procedures following which he, Dr. Korenman, would have ordered a CAT scan. The court asserts, ante at 703 n.4, that, when the witness said, "I would have ordered a CAT scan," he was really saying that appropriate medical care required a CAT scan. I do not agree that the court can now know, or that the jury could have known, that that is what the witness meant. Nevertheless, for purposes of discussion, let us assume that the jury properly could have understood Dr. Korenman's testimony about what he would have done as meaning that "appropriate medical care" would have required a CAT scan. Even so, that testimony was not enough to permit a finding of causation unless the jury also would have been warranted in concluding that the term, "appropriate medical care," as used by the witness, referred to the care to be expected of physicians of average competence.

Nowhere in the evidence is there any indication that Dr. Korenman understood and used the expression "appropriate medical care," to mean the care or treatment that averagely competent physicians would render in the circumstances. For all that appears, Dr. Korenman's concept of "appropriate medical care," undefined throughout his testimony, and his concept

of the level of care to be expected of physicians of average competence are two very different matters. Indeed, the doctor's statement, "I would have ordered a CAT scan," in response to a question about the requirement of appropriate medical care strongly suggests that the doctor understood appropriate medical care to be the treatment that he, as distinguished from an averagely competent physician, would have rendered. There is certainly nothing in the evidence to suggest that Dr. Korenman considered himself averagely competent. Surely, also, it cannot fairly be said that, by common usage of lay people, the term "appropriate medical care" has come to mean the care that would be given by physicians of average competence. For all that appears in the evidence, the expression, "appropriate medical care," as the witness understood and used it, referred not to a standard set by physicians of average competence but to a much higher standard. There is no basis in the evidence for the jury reasonably to have understood the evidence differently. Therefore, there was absolutely no justification in the evidence for the jury to conclude that, had Harlow returned to Chelsea Memorial Health Care Center in timely fashion, a CAT scan leading to successful surgery would have been performed. Viewed as favorably to the plaintiff as can be justified, the evidence does not support a finding of causation. Therefore, I would reverse the judgment for the plaintiff. I would order judgment for the defendants.

Because I conclude that the defendants are entitled to a judgment in their favor, I need not reach the "egregious argument" issue discussed by Justice Lynch in his dissenting opinion. Were I to do so, I would agree with Justice Lynch, for the reasons he gives, that a new trial should be required.