FEDERAL DEPOSIT INSURANCE CORPORATION, receiver,[1] *vs.*
HOLBROOK & JOHNSTON & another.[2]

No. 92-P-1072.

Hampden. December 14, 1993. - April 29, 1994.

Present: BROWN, KAPLAN, & LAURENCE, JJ.

*Escrow. Negligence,* Attorney at law, Gross negligence. *Attorney at Law,*
Negligence. *Real Property,* Sale.

At the trial of an action for breach of an escrow agreement the jury were
warranted in concluding on the evidence presented that the escrow
agent had been grossly negligent or acted in bad faith or committed
wilful misconduct or fraud in express violation of the agreement by its
failure to deposit the "gross proceeds" of the sale of certain lots of real
estate and to transmit a percentage of those proceeds to the lending
bank. [429-432]

CIVIL ACTION commenced in the Superior Court Depart-
ment on March 9, 1990.

The case was tried before *John F. Moriarty,* J.

*Robert H. Flynn* for the defendants.

*Martine B. Reed* for the plaintiff.

KAPLAN, J. Federal Deposit Insurance Corporation
(FDIC), as receiver of Bank of New England, N.A. (Bank),
sued the law firm Holbrook & Johnston and one of its part-
ners, William C. Johnston, for breach of an escrow agree-
ment. The defendants appeal from a judgment against them
after jury trial. Their principal contention is that the judge
erred in denying their motions for judgment notwithstanding
the verdict (or, in the alternative, for a new trial). Other con-
tentions are also mentioned below.

---

[1]Of the bank named in the opinion.
[2]William C. Johnston.

1. *Summary of trial record.* Properties of America, Inc. (POA), a property developer with central offices in Williamstown, had a $4,000,000 line of credit arrangement with the Bank under a "revolving note" instrument dated October 23, 1987. On that basis, the Bank lent POA $337,000 with which to acquire land in the town of Durham, Greene County, New York, for development and sale as individual lots. POA took title in the name of First Catskill Land Company, Inc. (First Catskill), a wholly-owned subsidiary of POA, and on July 15, 1988, that company gave a mortgage to the Bank on the land to secure the loan.

On September 30, 1988, POA, the Bank, and the law firm (by William C. Johnston) entered into a "Disbursement Escrow Agreement," in which the law firm was named "Escrow Agent." The agreement stated that POA, called the "Borrower," intended to resell thc lots — there were seventeen comprising the development — on a lot by lot basis, "with the Bank to receive 60% of the gross proceeds arising directly or indirectly from the sale by the Borrower of each Lot at such time as title to same is transferred by the Borrower to the purchaser thereof . . . ." Under the agreement, the Bank was handing to the escrow agent, to be held in escrow, seventeen partial releases (one to each lot) of the omnibus mortgage. (The partial releases were executed in blank by the Bank and bore on their face an amount representing sixty percent of the projected sale price of the lot.) The escrow agent was directed, with each lot closing transaction, "to deposit the entire gross proceeds of sale of such Lot" into the escrow account, and "thereafter simultaneously (i) to issue a check, drawn on said Escrow Account, in an amount equal to 60% of the gross sale proceeds" and transmit it, together with the executed purchase and sale agreement, to the Bank, and "(ii) to release from the terms of this Escrow Agreement the Partial Release of Mortgage with respect to the purchased Lot." The parties acknowledged in the agreement that the escrow agent was acting for the convenience of the

parties without receiving compensation for that function.[3] The parties agreed that "the Escrow Agent, in that capacity, shall not be held liable for mistakes of law or of [f]act, or errors of judgement, or for any loss suffered by any of the parties, except if the Escrow Agent shall have acted in bad faith, or in a grossly negligent manner, or shall have committed actual fraud or willful misconduct."

Peter Gebauer, senior vice president and head of the lending division of the Bank at the time, testified that the escrow agreement was installed with a view to tightening up the closing procedures on land sales.

Lots numbered four, five, and six, were the first Durham lots sold. Two of the closings occurred in October, 1988, and the third in November, 1988. Johnston (a real estate lawyer of nearly twenty years experience) was not present at the closings; he had sent the papers including the respective partial releases for closing to an attorney who lived closer to the relevant county seat. Following the expected course, each purchaser had earlier paid in ten percent of the purchase price to POA upon executing the purchase and sale agreement; at the closing, a deed to the lot passed from First Catskill to the purchaser; the purchaser gave his promissory note for the ninety percent balance of the purchase price to POA, secured by a mortgage on the lot; and the applicable partial release was recorded. POA, receiving the note and mortgage on the lot, sold (or had presold) these instruments, called "land paper," to a financial institution.

The law firm, as escrow agent, took no further steps in regard to these three lots, and no part of the moneys received by POA ever reached the Bank.

In June or July, 1989, and again in August or September, 1989, with doubts arising about the stability of POA, meetings of POA's secured creditors took place, at which there was discussion of the question of "out of trust" transactions,

---

[3]Presumably this provision would not bar the law firm from representing POA for compensation at closings including Durham closings. The escrow agreement reserved the escrow agent's right to "act[ ] as legal counsel or provid[e] any services to any party hereto . . . ."

i.e., cases of lot sales in POA developments where the lender banks (like the instant Bank) had not received their shares of the proceeds. Johnston was present at these meetings. He was then (and had been since 1985) a member of the board of directors of POA, and as of April, 1989, was a vice president in charge of "product development." Gebauer testified that the Bank was not informed of Johnston's status within POA.

With concern now current about out of trust sales, four additional Durham lots, numbers three, thirteen, fourteen, and fifteen, were sold in April, July and September, 1989. In these instances, the Bank did receive checks for its sixty percent shares from Johnston as escrow agent.

A "project recap" document, prepared by POA, covering all the POA developments financed by the Bank, was received by the Bank in February, 1989. This might have alerted the Bank that three Durham lots were out of trust — the document showed that three lots had been sold from that development — but the Bank (Gebauer) remained unaware of the fact until after it received a more detailed inventory from POA, dated in August, 1989, that focused on the Durham project alone. Gebauer had a conversation with Johnston about the failure to account to the Bank. Johnston indicated he would look into the matter, but there is nothing on this line in the record. POA filed for bankruptcy in October, 1989.

In this condition of the record, the defendants (having previously moved for dismissal at the close of the plaintiff's case) moved for a directed verdict at the close of all the evidence. Their principal contention was — conforming to the position Johnston attempted to take in his testimony for the defense — that in the lots four, five and six transactions there were no "gross proceeds arising directly or indirectly from the sale" in the sense of the escrow agreement: this because no cash actually passed at the closings. To the contrary, the plaintiff's position was, in effect, that the escrow agent was required to take an active role, to the extent of seeing to it that POA's receipts from the sales got into the

escrow, so that the Bank would obtain the shares due to it. In the defendants' view of the escrow agent's duty, proof was lacking that Johnston[4] had been grossly negligent, or acted in bad faith, or committed wilful misconduct or actual fraud. The judge denied a direction.

In charging the jury, the judge said "gross proceeds" was ambiguous and he left it to them, considering all the circumstances, to find the proper meaning. He defined the terms "bad faith," etc., in conventional ways.[5] He put to the jury two questions as to each of the three lot transactions: whether Johnston had "fail[ed] to perform his obligations under the escrow agreement," and, if so, whether the failure had been the result of bad faith, gross negligence, actual fraud, or wilful misconduct. A seventh question asked (assuming culpability) what amount of money was sufficient "to compensate the plaintiff and place it in as good a position financially" as if the agreement had been honored. The judge instructed that the votes of five-sixths of the jury were needed for effective response to questions, but membership of the fraction could vary from question to question.[6] The jury answered yes to the six questions,[7] and gave $84,357 in an-

_____

[4]It was agreed that there was no distinction between any liability of Johnston and that of the firm.

[5]"Bad faith" was defined in the judge's instructions as "breach of a known duty through some motive of intention or ill will and partakes of the nature of fraud." "Gross negligence": "an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care." "Actual fraud": "deliberate and intentional deception or misrepresentation for the purpose of wrongfully depriving another person of some property or benefit to which he is entitled." "Willful misconduct": "deliberate and intentional performance of a wrongful act knowing it to be wrongful, or it can be the deliberate and intentional failure to perform a known duty."

[6]As all fourteen jurors who heard the evidence were going to participate, and the fraction would not fit, the parties agreed that eleven votes would count for the five-sixths.

[7]The defendants argued that the jury may have been misled by the admission of questions, in Johnston's cross-examination, about another POA promotion, with Johnston serving as escrow agent, where the lending bank, Berkshire County Savings Bank, had not received payment on a lot sale. The testimony was allowed as tending to show that what happened in the present case was not the result of simple mistake. It was met on redirect

swer to the seventh (an amount near the sum of the sixty percent figures appearing on the partial releases for the lots).

On their motions for judgment n.o.v. (or a new trial), the defendants renewed their contention that there was a failure of proof of each charge from gross negligence to actual fraud.

2. *Discussion.* a. The jury resolved any ambiguity and fixed the meaning of "gross proceeds" and so forth as contended by the plaintiff; otherwise they could not have answered the special questions as they did. There was plenty of support for that interpretation of the obligations of the escrow agent under the "Disbursement Escrow Agreement"; indeed, contrary to the defendants' objection that the judge should have exonerated them under the "plain meaning" of the text, the judge might well have ruled out of hand in the plaintiff's favor on the interpretive question. To relieve the agent of a duty to pursue or attempt to pursue the monies POA received "directly or indirectly" from the lot transactions — notably the receipts from POA's sales of the land paper — would turn the escrow arrangement into a triviality. This would not have been the intention of the Bank, nor should it in reason have been Johnston's understanding. When pressure came on, Johnston proved able somehow to fulfil the object of the agreement and transmit to the Bank the sixty percent shares of the gross proceeds resulting from the four subsequent lot transactions.

b. With the scope of Johnston's obligations settled by the jury (there was nothing in the defendants' objection that the plaintiff had to produce expert testimony on the point, see *Turcotte* v. *DeWitt*, 332 Mass. 160, 165 [1955]), the jury's remaining task was to find the measure of his fault in his failing to perform: a finding of mere negligence would not support a plaintiff's verdict, but a finding anywhere up the scale from gross negligence to actual fraud would do so. The experienced judge who tried the case evidently thought that the facts were sufficient to justify, as against a motion for

with the counterpoint that the two situations were not comparable. The exchange was not important in the context of the trial.

judgment n.o.v.,[8] even the most severe characterization by the jury of Johnston's misconduct, and we respect that view.[9] However the case can be dealt with on simpler terms. The record, at the least, supports a jury finding of gross negligence, and that concludes the case in favor of the plaintiff. First, faced with the task of assessing the gravity of Johnston's conduct, a reasonable jury would be expected to give first attention to whether the least severe degree of fault entailing liability was proved; if the answer to that question was in the affirmative, the jury, quite sensibly, would go no further. Second, the defendants put a hypothetical: suppose a juror votes a yes in the conviction that Johnston had committed actual fraud, when (still speaking hypothetically) there was insufficient evidence to base such a fraud finding.[10] That, in our view, would not impeach the juror's vote, for that juror, who found fraud (or bad faith or wilful misconduct), would surely agree that if an evil intention on the actor's part must be considered unproved, gross negligence remained, and the juror would join in the finding of that lesser degree of fault still resulting in a plaintiff's verdict.[11]

---

[8]In reviewing the denial of a motion for a directed verdict or for judgment n.o.v., a court determines "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'" *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

[9]The plaintiff laid particular stress on: Johnston's long experience as a real estate attorney; his apparent clear breach of the agreement; his different performance on the later sales where the bank did receive its sixty percent; the evidence that he did not inform the bank of his positions within POA; his failure to act after being notified by the bank that it had not been paid.

[10]In contending for judgment n.o.v., the defendants suggested that the judge erred in lumping the four degrees of fault in the questions to the jury: hence the hypothetical. Such a contention should have been made, if at all, in the form of an objection to the form of the questions or as a request for instructions; it came too late at the stage of judgment n.o.v. Nevertheless we discuss it.

[11]Compare *Commonwealth* v. *Ramos*, 31 Mass. App. Ct. 362, 368 (1991), where upon evidence of but one event, the defendant, charged as principal or joint venturer, was held not entitled to a jury instruction that they must bring in a unanimous verdict on at least one theory. "If five jurors thought the defendant actually wielded the knife, and seven jurors

We observe in passing that the Supreme Court has recently upheld a verdict and judgment in a criminal case in circumstances far less attractive analytically than those at bar.[12]

c. When the Bank foreclosed the portion of the omnibus mortgage covering the unsold lots of the Durham project, it bid an amount to buy in the property (except for one lot bought by a third party), but did not apply for a deficiency judgment. We may take it that under New York law the FDIC would have no further claim to recover on the (reduced) note against the promissor (mortgagor) or a guarantor (if there had been one). See N.Y. Real Prop. Acts. Law §§ 1301, 1371 (McKinney 1979); *TBS Enterprises, Inc.* v.

---

thought the defendant held the victim while his accomplice did the stabbing, the shared mental state tied together the defendant and his accomplice, making irrelevant who did what in the shared enterprise." *Ibid.* See also *Schad* v. *Arizona*, 501 U.S. 624 (1991) (jury not required to agree on a single theory of first degree murder, when offered alternatives of premeditated murder and felony murder).

[12]In the present case the jury could choose among four characterizations of a set of facts. In *Griffin* v. *United States*, 502 U.S. 46 (1991), Griffin was charged with conspiring to defraud an agency of the United States with two distinct objects turning on different facts: to impair the efforts (1) of the Internal Revenue Service to ascertain income taxes, and (2) of the Drug Enforcement Agency to ascertain forfeitable assets. The judge instructed over objection that the jury could return a verdict of guilty if it found Griffin to have participated in either one of the two objects of the conspiracy. On appeal from the judgment on a verdict of guilty, the Court assumed there was a lack of evidence on the second object, but it upheld the verdict, distinguishing between a basis of conviction that was legally inadequate (say illegal for a constitutional reason), where the verdict fails, and a basis that was factually inadequate, where the verdict is upheld. Our decisions in criminal cases do not speak of a distinction and seem to look toward invalidating a verdict where an alternative is unsupported in fact. See *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988); *Commonwealth* v. *Eldridge*, 28 Mass. App. Ct. 936, 937-938 (1990); *Commonwealth* v. *Kickery*, 31 Mass App. Ct. 720, 724 (1991). Cf. *Commonwealth* v. *Lemar*, 22 Mass. App. Ct. 170, 171-172 (1986). In civil cases the general verdict is evidently assumed to be based on the ground for which there is sufficient evidence. See *Pelton* v. *Nichols*, 180 Mass. 245, 246 (1902); *Kelly* v. *Citizens Fin. Co. of Lowell, Inc.*, 306 Mass. 531, 534 (1940).

As noted, the present verdict does not encounter like analytical difficulties and is readily upheld.

*Grobe*, 114 A.D.2d 445, 448 (N.Y. 1985).[13] This leads the defendant to speak of the FDIC being pro tanto "satisfied" — a fictitious satisfaction — and, adding previous actual receipts (as for the four lots), the defendants try to make out that the Bank/FDIC suffered no ultimate loss on the $337,000 investment in the Durham enterprise. All beside the point, as the judge ruled: the defendants are not in the shoes of a mortgagor and are sued for breach of a distinct agreement. See *Marine Midland Bank-Cent.* v. *Gleason*, 62 A.D.2d 429, 435 (N.Y. 1978); *Corley* v. *Miller*, 133 A.D.2d 732, 734-735 (N.Y. 1987).

*Judgment affirmed.*

---

[13]It is of no moment that the escrow agreement says it is to be construed according to the law of Massachusetts.