ATTORNEY GENERAL *vs*. WEYMOUTH AGRICULTURAL
AND INDUSTRIAL SOCIETY.

Suffolk. April 7, 1987. — July 13, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Corporation,* Agricultural society, Charitable corporation. *Charity. Agriculture. Words,* "Public charity."

The Weymouth Agricultural and Industrial Society (Weymouth), an entity which had been formed to promote agriculture, and which had involved itself in operating agricultural fairs, was held not to be a "public charity" within the meaning of G. L. c. 12, § 8F, requiring annual filing with the division of public charities in the Department of the Attorney General of a written report for the preceding fiscal year, containing certain financial and other information, where it did not appear either that Weymouth's incorporators intended to create a charitable corporation or to give or appropriate funds to a public charity, or, even if not established as a public charity, that Weymouth so conducted itself as to become a public charity for the purposes of § 8F. [478-484]

CIVIL ACTION commenced in the Superior Court Department on July 3, 1980.

The case was heard by *Robert L. Steadman,* J., on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Richard L. Neumeier* for the defendant.

*Eric B. Carriker,* Assistant Attorney General (*Richard Allen,* Assistant Attorney General, with him) for the Attorney General.

WILKINS, J. The issue is whether the Weymouth Agricultural and Industrial Society (Weymouth) is a "public charity" within the meaning of G. L. c. 12, § 8F (1984 ed.). If so, § 8F obliges Weymouth's governing board annually to file with the division of public charities in the Department of the Attorney General a written report for its preceding fiscal year, containing

certain financial and other information. Weymouth, which was incorporated under G. L. c. 180 in 1945, has never filed such an annual report.

The Attorney General commenced this action in July, 1980, seeking an order that Weymouth file annual reports. A judge of the Superior Court allowed the Attorney General's motion for summary judgment and denied Weymouth's similar motion. We allowed Weymouth's petition for direct appellate review. We reverse the judgment because Weymouth has not been shown to be a public charity within the meaning of § 8F.

The Attorney General has a mandate under G. L. c. 12, § 8 (1984 ed.), to "enforce the due application of funds given or appropriated to public charities . . . and prevent breaches of trust in the administration thereof." Although G. L. c. 12, § 8A (1984 ed.), sets forth definitions applicable to § 8F, the term "public charity" is not defined.[1] The meaning of the words "public charity" in § 8F must be determined by application of general principles, both of statutory construction and of what a charity is.[2] We derive no firm guidance from the legislative history of § 8F. As first proposed in 1954, the goal was to require charitable trusts, as defined, to file annual reports. 1954 House Doc. No. 2031. See also Report and Recommendation for Legislation of Former Attorney General Bushnell, Pub. Doc. No. 12 (1945), reprinted in 30 Mass. L. Q. No. 1, at 22 (1945). As enacted, § 8F clearly reaches more than charitable trusts. We think it clear that the Legislature was concerned

---

[1] At the time this action was commenced, a regulation (adopted by the director of the division of public charities pursuant to G. L. c. 12, § 8J [1984 ed.]), defined a public charity to refer "to those endeavors commonly regarded as constituting a public charity and shall include, without limitation: (a) Any corporation which constitutes a public charity organized under [G. L. c. 180] or created by special act." 940 Code Mass. Regs. § 2.01 (3) (1979). A somewhat more instructive definition, adopted after this action was commenced, provides that a public charity is "[a]ny organization that is charitable as determined by Massachusetts law including statutory and case law irrespective of its categorization under federal definitions." 940 Code Mass. Regs. § 2.01 (3) (1980).

[2] Whatever historical value the word "public" may have had, it is of no particular assistance in resolving the issues in this case.

with the supervision of entities holding funds committed to charitable purposes.

A "public charity" for purposes of § 8F is an entity which has a legal obligation to apply some or all of its funds for purposes that are charitable. A public charity can arise in two general ways, either by being organized with the intent to limit the organization's use of its funds to charitable purposes, or by engaging in conduct which results in the entity holding funds for charitable purposes. Such conduct includes accepting funds on express trust for charitable purposes as well as holding the entity out as charitable and soliciting and accepting donations on the basis of a charitable appeal.

After a brief summary of the facts, we shall separate our analysis into two parts. We shall first consider whether Weymouth was formed as a public charity, an analysis which involves the intent of Weymouth's incorporators. Our conclusion is that it was not. Secondly, we shall consider whether Weymouth, even if not established as a public charity, has become a public charity by its conduct. Our conclusion is that Weymouth has not held itself out so as to become a public charity within the meaning of § 8F.[3]

Weymouth's articles of organization state that it was formed under G. L. c. 180 "[t]o encourage agriculture, horticulture and kindred products, to conduct agricultural exhibits and to acquire, own and manage property in the furtherance of these objects . . . ." It initially issued 1,000 shares of stock at a par value of $25. At their first meeting the incorporators voted to accept by-laws. The by-laws refer to the "business" of the corporation and instruct the directors to do all lawful acts calculated "to promote, to the fullest extent, the interest of the stockholders." The by-laws contain neither a provision which expressly states whether the corporation was formed for chari-

---

[3] We are dealing here with an issue under § 8F and recognize that an entity may be treated as charitable for one purpose and not for another. Compare *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248 (1936) (Boston Symphony subject to local property tax), with *Boxer* v. *Boston Symphony Orchestra, Inc.*, 339 Mass. 369 (1959) (Boston Symphony entitled to charitable immunity).

table purposes nor a provision concerning dividends or distribution of assets on dissolution.

Weymouth acquired the Weymouth Fair Grounds, first conducted a fair there in 1945, and held fairs in subsequent years. Pursuant to G. L. c. 128A (1984 ed.), Weymouth received a license for parimutuel horse or dog racing as a State fair from 1946 to 1970 and from 1972 to 1978, inclusive, although in a number of years the racing occurred at tracks located elsewhere. The fair included agricultural exhibits, exhibits of livestock, vegetables, fruit, flowers, and dairy, poultry, and canned products. The fair also included a carnival with a midway, rides, food and beer concessions, and 4-H Club shows and exhibits. In certain years the Commonwealth allotted funds as prize money for winners of 4-H Club and other agricultural exhibit competitions. In certain years the Commonwealth paid rehabilitation allotments for upgrading agricultural displays, for animal health, and for tent rental. The fair's agricultural expenses always exceeded related income; its income from racing usually far exceeded related expenses.

Weymouth has not declared a dividend since its incorporation in 1945. Its stock is transferable but must first be offered to the directors at a price annually fixed by them. We invalidated a 1970 agreement to sell 75% of Weymouth's stock in *Simon v. Weymouth Agricultural & Indus. Soc'y,* 389 Mass. 146, 152 (1983).[4] The discussion of the issues in our 1983 opinion proceeded as if Weymouth was not a public charity, but the point was not before the court, and none of the parties had any apparent reason to raise it.

The Attorney General argues that the principal corporate purposes of Weymouth stated in its articles of organization — "to encourage agriculture" — and "to conduct agricultural exhibits" — are charitable purposes. We agree that encouragement of agriculture can be a charitable purpose (see *Assessors*

---

[4] The invalidated transaction involved the receipt by certain stockholders of assets arguably worth more than the par value of their shares, following a vote of interested directors purporting to decline to purchase shares tendered to the corporation.

*of W. Springfield* v. *Eastern States Exposition,* 326 Mass. 167, 170 [1950]; *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 717-718 [1944]; *Jackson* v. *Phillips,* 14 Allen 539, 551 [1867]), and that a corporation might be formed under G. L. c. 180 as a public charity to encourage agriculture. Not every corporation formed under G. L. c. 180, § 4 (1984 ed.), is for that reason alone a charitable corporation. See *Matter of Troy,* 364 Mass. 15, 57 (1973), and cases cited.[5] A c. 180 corporation could be formed for stated purposes that are charitable and yet it might not be a public charity, perhaps, for example, because it was never intended that its activities should benefit a sufficiently large and indefinite class of persons or because its earnings could inure to the benefit of noncharitable objects. *Id.* at 58.[6]

We agree with the Attorney General that Weymouth could be a charitable corporation even though it issued stock to shareholders. See *Minns* v. *Billings,* 183 Mass. 126, 132 (1903). At the time of Weymouth's incorporation, a c. 180 corporation could issue stock (G. L. c. 180, § 3, as amended through St. 1943, c. 549, § 5), and, although that is no longer so (G. L. c. 180, § 3, as most recently amended by St. 1986, c. 644, § 5), the rights of holders of stock previously issued by c. 180 corporations (and other entities) have been preserved. See St. 1947, c. 559, § 7, and St. 1971, c. 819, § 11. These

---

[5] The assets of those c. 180 corporations that are not public charities perhaps may become the property of shareholders, incorporators, and the like on dissolution. See G. L. c. 180, § 11A (1984 ed.), requiring the application of cy pres principles only on the voluntary dissolution of "[a] charitable corporation constituting a public charity." See also G. L. c. 180, § 11B (1984 ed.), providing similarly on a public charity's involuntary dissolution. Section 11, which concerns the dissolution of a corporation "which does not constitute a public charity," makes no reference to the administration of its funds following dissolution for similar public charitable purposes.

[6] The issue here is not, as it is in some cases, whether the dominant purpose of Weymouth's work was for the public or for members of an organization (or a limited class of persons). See *Massachusetts Medical Soc'y* v. *Assessors of Boston,* 340 Mass. 327, 332 (1960); *Boston Chamber of Commerce* v. *Assessors of Boston, supra* at 713.

savings provisions, or "grandparent" clauses, suggest that the holders of stock in c. 180 corporations had or could have an interest in corporate assets.

We also agree that Weymouth does not evade characterization as a charitable corporation or public charity simply because it was formed as a c. 180, § 4, corporation "for the purpose of encouraging agriculture" (G. L. c. 180, § 4, as amended through St. 1927, c. 133, § 1) rather than as a c. 180, § 2, corporation for a "charitable " purpose (G. L. c. 180, § 2, as amended through St. 1915, c. 213). We find little instruction in resolving the issue before us in differences in the legislative treatment, now and formerly, of property tax exemptions for charitable organizations (G. L. c. 59, § 5, Third [1984 ed.]), and for incorporated agricultural societies (G. L. c. 59, § 5, Fourth A [1984 ed.]). In making the distinction, however, the Legislature has recognized that incorporated agricultural societies may be treated differently from traditional charitable organizations and that they are not automatically entitled to exemption as charitable institutions. We further agree with the Attorney General that Weymouth or any other corporation could be a charitable corporation even though it has never solicited or received any charitable contribution. *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 390 (1937).

There are several circumstances that we conclude have no significance in resolving the question before us. (a) The fact alone, if it is a fact, that Weymouth's initial and subsequent shareholders never expected to receive a dividend is not helpful. (b) We find uninstructive the beliefs of Weymouth's shareholders, directors, and officers in recent years as to whether Weymouth was or was not a charitable corporation. (c) Weymouth's status as an exempt organization under § 501 (c) (5) of the Internal Revenue Code does not bear on the issue before us. The Attorney General's 1980 regulation defining a public charity proclaims that "categorization under federal definitions" should be ignored. 940 Code Mass.

Regs. § 2.01 (3) (1980.)[7] (d) Similarly, we regard as not important in this case the facts that (1) Weymouth purchased public liability insurance during the period when the defense of charitable immunity was available to charitable corporations, (2) Weymouth has never sought a sales tax exemption available to charities (G. L. c. 64H, § 6 [*e*] [1984 ed.]),[8] and (3) Weymouth never sought exemption from the unemployment compensation tax available to certain charitable corporations under G. L. c. 151A, § 6 (*g*), as amended through St. 1964, c. 454, from Weymouth's founding until 1971 when the exemption was repealed (see St. 1971, c. 940, § 9). No inference in Weymouth's favor can be drawn from its inaction in these various matters. (e) Nor does the fact that Weymouth has made relatively minor charitable gifts from time to time tell us about the intent of Weymouth's founders or indicate one way or the other that Weymouth was a charitable entity.

We turn then to the relevant parts of the record and conclude that it does not show that Weymouth's incorporators intended to create a charitable corporation or to give or appropriate funds to a public charity. The purposes stated in Weymouth's charter are ambiguous on the question. Its by-laws are not. They refer to the "business" of the corporation. They direct that action be taken to promote the interests of the stockholders. Such a provision makes no sense if the stockholders had no financial interest in Weymouth. There is no indication that the incorporators and initial stockholders intended to make a gift of the purchase price of their stock to the corporation or to forgo their ownership of the assets of the corporation. Indeed, the by-laws do not limit a shareholder to the recovery of his initial investment in the event he wishes to sell his shares. The

---

[7] Treasury Regulation § 1.501(c)(5)-1 (1960) states that a § 501(c)(5) organization must have "no net earnings inuring to the benefit of any member." We need not decide whether Weymouth met or meets this test.

[8] Qualification for this tax exemption required § 501 (c) (3) status which Weymouth never has had and never has sought. If Weymouth had received a charitable gift, the donor probably could not have taken a charitable deduction for Federal income tax purposes. Such a deduction is available only for gifts to entities which would qualify for § 501 (c)(3) status. See I.R.C. § 170 (c) (2) (1987).

by-laws did not exclude the potential for profit from the sale of stock in Weymouth. We view as a neutral factor the silence of the by-laws (which could be amended by a vote of a majority of Weymouth's shares) and the silence of the articles of organization on the subject of the distribution of corporate assets (to the stockholders or elsewhere) on dissolution. We regard other indicators of intent as controlling. See *Assessors of Boston* v. *World Wide Broadcasting Found.,* 317 Mass. 598, 603 (1945). Weymouth was not established as a public charity.

We come to the question whether Weymouth has so conducted itself as to become a "public charity" for the purposes of § 8F. We reject the idea that a corporation whose incorporators intended that it exist for charitable purposes can avoid application of its funds to charitable purposes by ignoring or abandoning those charitable purposes. The fact, if it is a fact, that Weymouth's activities over time came to focus on parimutuel racing and other entertainment at the expense of the direct promotion of agriculture will not permit Weymouth to avoid its charitable status if its incorporators intended that Weymouth be a charitable corporation. We accept the idea, however, that a corporation not established for charitable purposes may by its conduct become a public charity for the purposes of § 8F. Acceptance of gifts on condition that they be used for charitable purposes or solicitation and receipt of funds on the representation that a c. 180 corporation is a charitable entity or that its purposes are charitable go a long way toward establishing that entity as a public charity because the intent of § 8F is that the Attorney General should obtain an annual report in those circumstances. See G. L. c. 68, § 18, as appearing in St. 1985, c. 790, § 1, defining a charitable organization to include "one holding himself out to be a charitable organization." In such a case, the entity must be bound by its representation and may not avoid compliance with § 8F on the ground that it is not really a charitable entity. Nothing in this record shows that Weymouth ever solicited or received a charitable gift or appropriation. Certainly there is nothing inherently charitable about the operation of a seasonal county fair, Weymouth's sole activity. There is no showing that the fair was ever held out as benefiting charitable causes.

In various years (and in connection with qualifying for a racing license, G. L. c. 128A, § 3 [1984 ed.]), Weymouth qualified, in the view of the Commissioner of Food and Agriculture, as a county fair, that is, "an agricultural fair or exhibition, the main purpose of which is the encouragement, improvement, or extension of agriculture by competitive exhibits of agricultural products . . . and of varied types of available livestock . . . ." G. L. c. 128A, § 1 (1984 ed.). In certain of those years State-funded "premiums" were paid directly to winners of agricultural exhibit competitions at the Weymouth fair. In some years the Commonwealth paid Weymouth between $2,200 and $5,000 as "rehabilitation allotments" for upgrading agricultural displays, animal health and tent rental. There is no indication that Weymouth or any other county fair was entitled to such funds only if it was a public charity (or held itself out as one), and nothing indicates that the expenditure of such limited amounts of public funds in support of the agricultural aspect of the fair would have been improper if Weymouth were not a public charity.[9]

There is no suggestion that there is a dispute of material facts to be tried or that there is other evidence that could be presented on the issue before us. The case is before us, in effect, on an uncontested record, and we should decide it. The burden is on the Attorney General to show that Weymouth is a public charity. For reasons we have stated, he has not met that burden. In the more than twenty-five years between 1954, when § 8F was first enacted, and 1980, when this action was commenced, no Attorney General sought to apply the annual filing requirements of § 8F to c. 180 corporations operating

---

[9] Weymouth may have obtained its racing licenses at a reduced fee under G. L. c. 128A, § 4 (1984 ed.), by satisfying the State Racing Commission that the main purpose of its fair was "the encouragement or extension of agriculture and that the same constitutes a bona fide exhibition of that character." G. L. c. 128A § 3 (*g*). The licensing statute places no limitation on the use of the net proceeds of the fair or of its licensed betting and imposes no requirement that net proceeds be used only for charitable purposes. Contrast G. L. c. 10, § 38 (1984 ed.) (limiting the use of profits of licensed beano games).

agricultural fairs.[10] An entity running an agricultural fair hardly fits any general conception of what a public charity is. The Legislature has put agricultural fairs in a separate category from traditional charitable corporations. Although an entity operating an agricultural fair could be a public charity, the fact alone that it was formed to promote agriculture does not make it one.

Summary judgment for the Attorney General is vacated, and summary judgment shall be entered dismissing the complaint.

*So ordered.*

---

[10] Entities operating county fairs which receive allotments of prize money are required to make annual reports to the division of fairs in the Department of Food and Agriculture. 330 Code Mass. Regs. § 7.05(3) (1982).