JANET CONNERS *vs.* NORTHEAST HOSPITAL CORPORATION
& others.[1]

Essex. February 3, 2003. - May 29, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Charity. Hospital. Corporation,* Charitable corporation. *Snow and Ice. Negligence,* Hospital, Snow and ice, Standard of care. *Statute,* Construction. *Practice, Civil,* Instructions to jury.

In an action against a hospital that owned and maintained the parking lot in which the plaintiff slipped on an accumulation of ice and snow and was injured, the judge did not err in modifying the judgment in the amount of $183,000 against the hospital pursuant to G. L. c. 231, § 85K, which limited the liability of charitable corporations to $20,000, where the hospital established that it was a charity [472-477], and that its snow removal activities directly accomplished its charitable purposes and were not primarily commercial in character. [477-480] IRELAND, J., concurring.
In a negligence action, the judge's instructions to the jury on the issues of duty of care and breach were legally adequate. [480-481]

CIVIL ACTION commenced in the Superior Court Department on April 15, 1999.

The case was tried before *Barbara J. Rouse,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Paul R. Schneider* (*Janet H. Pumphrey* with him) for the plaintiff.

*John D. Bruce* for Northeast Hospital Corporation.

*Brian J. Mone* for J. Marchese & Sons, Inc.

*Beth R. Levenson* for William O'Hearn.

The following submitted briefs for amici curiae:

*Michael K. Gillis, Matthew P. McCue, & John J. St. Andre* for Massachusetts Academy of Trial Attorneys.

---

[1]J. Marchese and Sons, Inc., and William O'Hearn, doing business as Bill and Bob's General Contractors (collectively, subcontractors); and William Charette.

*Lawrence B. Litwak, M. Robert Dushman, Cheryl B. Pinar-chick, & Maggie Gold Seelig* for Massachusetts Hospital Association, Inc.

MARSHALL, C.J. On April 2, 1997, while walking from a parking lot into the building where she worked, Janet Conners slipped on an accumulation of ice and snow and suffered a serious injury to her leg. She brought an action for damages against Northeast Hospital Corporation (Northeast), which owned and maintained the parking lot as part of a complex of buildings on its hospital campus. She also sued a Northeast employee — the director of its plant operations — and two Northeast subcontractors. The case was tried before a jury in the Superior Court; they found no liability against the employee and the subcontractors, found Northeast negligent, and awarded Conners damages against Northeast in the amount of $183,000. The trial judge allowed Northeast's motion to amend the judgment to $20,000, pursuant to G. L. c. 231, § 85K, which limits the liability of charitable corporations to that amount.[2]

Conners appealed, challenging the imposition of the charitable cap on damages she had been awarded against Northeast, as well as certain of the judge's jury instructions concerning the subcontractors' negligence. We granted Conners's application for direct appellate review. We now affirm.

1. *Background.* We first summarize the evidence pertaining to Conners's attack on Northeast's limitation on liability. Northeast was incorporated in 1893 as Beverly Hospital Corporation under a precursor to G. L. c. 180, the statute governing charitable corporations. Sometime before 1997, Northeast underwent a corporate reorganization, and, by amendment in 1997, changed its name to "Northeast Hospital Corporation." As stated in its

[2]General Laws c. 231, § 85K, provides, in pertinent part: "It shall not constitute a defense to any cause of action based on tort brought against a corporation . . . that said corporation . . . is or at the time the cause of action arose was a charity; provided, that if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation . . . liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. Notwithstanding any other provision of this section, the liability of charitable corporations . . . shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes."

articles of organization, Northeast's purpose is "the care and treatment of the sick, especially the worthy poor of the Town of Beverly, and the other general purposes of a hospital."

As part of its assets, Northeast owns the Beverly Hospital campus, which consists of, among other things, the hospital, several parking lots, and a condominium complex, known as The Medical Building, housing various physicians' practice groups. Northeast does not own The Medical Building itself, but owns the land beneath it, which is leased to the building's condominium association. Northeast receives a "modest," below market-rate, annual payment for that lease. Physicians who practice in The Medical Building are on the staff and have admitting privileges at the hospital.

As an acute care hospital, Northeast competes with several other area hospitals for its share of patients. Northeast's chief financial officer, John O. Wilhelm, Jr., testified that to maintain its "financial viability," the hospital undertook "to make it attractive for doctors to admit patients to the hospital." To that end, the hospital sought "to foster good relations" with the physicians whose practice groups were located in The Medical Building condominium.

The plaintiff was an employee of one such physician practice group, and she was injured in the Northeast parking lot (B-2) located adjacent to The Medical Building. As provided by the terms of the lease between Northeast and the condominium association, the parking lot was available for parking by employees (such as the plaintiff) and patients of the physician practice groups, as well as employees, patients, and visitors to the hospital.[3] Northeast undertook to provide snow removal services for this and other parking lots on its campus. It did not generate any revenue from the snow removal activities, but paid contractors, such as the defendant subcontractors, to carry out those services. Annually, the cost to Northeast of snow removal expenses was approximately $90,000.

According to the testimony of Wilhelm, Northeast generated revenue from the treatment and care rendered to some of its

---

[3]There was evidence that the parking lot was also used to park school buses overnight, but there is no evidence as to whether Northeast obtained any revenue from that use.

patients, but the hospital also provided care at below-cost rates, or at no cost, to other patients. For example, of the patients receiving care from Northeast that year, approximately eighty-five per cent were covered by some form of insurance, either commercial or government, approximately fifty-five per cent of whom were Medicaid and Medicare patients. Wilhelm testified that the government "only pays seventy-five per cent" of the hospital's costs under the Medicaid program, and that "the Medicare outpatient fee schedules pay us far less than costs." Of the remaining fifteen per cent of Northeast's patients, about ten per cent included "free care" and "bad debt" patients.[4] Notwithstanding the financial challenges facing Northeast, it admitted as a patient "[e]veryone" who sought treatment at the hospital, even if they were unable to pay. In addition to providing acute care, Northeast was engaged in a wide range of health-related activities to improve the health of individuals in the North Shore community and beyond.[5]

2. *Applicability of G. L. c. 231, § 85K.* Northeast has not appealed from the jury's finding of liability against it. The sole issue with respect to the hospital is whether it was error for the judge to modify the judgment against it pursuant to G. L. c. 231, § 85K. Conners argues that the judge erred because Northeast failed to establish (1) that it was a "charity"; (2) that its snow removal activities were carried on "to accomplish directly" its

---

[4]John O. Wilhelm, Jr., testified that "free care" is provided to indigent patients who are not insured and cannot pay for the cost of treatment, at a cost to Northeast of several million dollars each year. "Bad debt" describes the debt incurred by patients who do not initially claim indigency but who nevertheless do not pay for their treatment. According to Wilhelm, "most hospitals . . . believe that a significant majority of bad debts is really free care," because patients are "afraid" to inform a hospital at the time of admission that they are indigent "for their fear that [a hospital] won't give them treatment."

[5]These activities were described in detail in Northeast Health System Inc.'s "1997 Community Benefits Report," a report submitted with Northeast's 1996 Federal tax return as an attachment to Form 990, covering the period beginning October 1, 1996, and ending September 30, 1997. Examples included: conducting educational programs and seminars; providing free and low-cost screening, outreach and support services to members of the public (including services specifically targeted at "underserved" populations); and implementing a "community health assessment" to identify the community's health needs.

charitable purposes; and (3) that such activities were not "primarily commercial in character." G. L. c. 231, § 85K.

As we noted recently in *Keene* v. *Brigham & Women's Hosp.*, *ante* 223, 238-239 n.25 (2003), the Legislature enacted G. L. c. 231, § 85K, in the wake of *Colby* v. *Carney Hosp.*, 356 Mass. 527, 528 (1969), where we announced our intention to abolish the doctrine of charitable immunity. See *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 425 (1989), cert. denied, 493 U.S. 1056 (1990); 1971 House Doc. No. 5976; 1970 House Doc. No. 723. In proposing the legislation, Governor Francis W. Sargent stated that "certain institutions, by their nature and the quality and character of their charitable endeavor, should be treated differently, with regard to their legal liability, from those institutions of a different nature." 1971 House Doc. No. 5976 (Governor's address to Legislature). It was "necessary," he said, "to balance the desirability of protection for [charitable] corporations . . . against the interest of the person who is injured as a result of a tort for which the nonprofit corporation is responsible." 1971 House Doc. No. 5976, quoting recommendations of the Forty-sixth Annual Report of the Judicial Council. See 1970 House Doc. No. 723 (recommendations of Judicial Council). Hospitals were among the charitable institutions specifically targeted to be "treated differently." 1971 House Doc. No. 5976, *supra.* As finally enacted, G. L. c. 231, § 85K, is applicable to all charities, and embodies the "balance" sought by the Governor. See *Morrison* v. *Lennett*, 415 Mass. 857, 861 (1993) (purpose of § 85K); *English* v. *New England Med. Ctr., Inc.*, *supra* at 429 (importance of purpose). The Legislature thus pursued "the legitimate objective of preserving charitable assets," *id.* at 430, while evincing an intent to "confine narrowly the doctrine of charitable immunity." *Mullins* v. *Pine Manor College*, 389 Mass. 47, 63-64 (1983). We consider Conners's statutory arguments in light of this background.

(a) *Status as a charity.* Conners first claims that, by 1997, Northeast no longer "functioned" as a charity "in any meaningful sense of the word," but was a "commercial enterprise." See *Harlow* v. *Chin*, 405 Mass. 697, 715 (1989) ("In order to enjoy the statutory cap, a hospital must prove . . . that it is a charit-

able organization . . ."). Conners concedes that Northeast's articles of organization are prima facie evidence of its charitable character and purpose, and that no shareholders own or control Northeast's income, see *Barrett* v. *Brooks Hosp., Inc.*, 338 Mass. 754, 757-758 (1959), but she points to evidence tending to show that Northeast was a sizeable enterprise, integrated into a corporate structure with several for-profit businesses; generated much of its substantial revenue from paying or fully insured patients; received only a "trivial amount" of its income from charitable sources; and provided minimal amounts of free care.

Conners ignores the fundamental distinction of purpose that separates charitable from for-profit corporations. "An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work." *Western Mass. Lifecare Corp.* v. *Assessors of Springfield*, 434 Mass. 96, 102-103 (2001), quoting *New England Legal Found.* v. *Boston*, 423 Mass. 602, 609-610 (1996). See *Barrett* v. *Brooks Hosp., Inc., supra* at 759, quoting *Assessors of Boston* v. *Garland Sch. of Home Making*, 296 Mass. 378, 387 (1937) ("A purpose qualifies as charitable if it 'is for the benefit of "the public at large or some part thereof, or an indefinite class of persons" . . .' "). Northeast falls squarely within this definition. Its purpose, "the care and treatment of the sick," has long been recognized as charitable. See, e.g., *Western Mass. Lifecare Corp.* v. *Assessors of Springfield, supra* at 103 (provision of health care recognized as "a traditional charitable purpose"); *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge*, 384 Mass. 536, 543 (1981), and cases cited ("the promotion of health, whether through the provision of health care or through medical education and research, is today generally seen as a charitable purpose"). Cf. Restatement (Third) of Trusts § 28 (2003) ("Charitable trust purposes include . . . the promotion of health").

A hospital, like any other corporation formed under G. L. c. 180, may nevertheless not qualify as a public charity where it

was "never intended that its activities should benefit a sufficiently large and indefinite class of persons or because its earnings could inure to the benefit of noncharitable objects." *Attorney Gen.* v. *Weymouth Agricultural & Indus. Soc'y*, 400 Mass. 475, 479 (1987). Conners states that the "net operating income" of Northeast "inured to the benefit of the growing institution and its controlling officers and staff." This is a serious charge, without record citation, and we see no evidence that any officer or member of Northeast's staff benefited personally from Northeast's charitable status or from its "net operating income." See *Barrett* v. *Brooks Hosp., Inc., supra.* Cf. *Roosen* v. *Peter Bent Brigham Hosp.*, 235 Mass. 66, 67-68 (1920) (charitable status not affected by compensation from patients where "[a]ll such payments are devoted exclusively to charitable uses and not at all for private gain").

The size of an institution is irrelevant to a determination of charitable status, as is the source of its revenue. See *Barrett* v. *Brooks Hosp., Inc., supra* at 760, quoting *Worcester* v. *New England Inst. & New England Sch. of Accounting, Inc.*, 335 Mass. 486, 493 (1957) (fees charged for services do not "destroy the public character of its purpose"). Nor is the absence of charitable gifts fatal. *Id.* at 760. Compare *Beverly Hosp.* v. *Early*, 292 Mass. 201, 201 (1935) ("[Beverly Hospital] is a charitable corporation, and is none the less such because it charges those who are able to pay"), and *Harlow* v. *Chin, supra* at 716 ("fact that a fee was charged . . . is not sufficient to take the hospital out of the protection of G. L. c. 231, § 85K"), with *Western Mass. Lifecare Corp.* v. *Assessors of Springfield, supra* at 104 ("selection requirements, financial or otherwise, that limit the potential beneficiaries of a purported charity" foreclose organization's ability to claim charitable status). The critical inquiry is whether the purpose of the organization is to benefit a select few, rather than the wider community. Cf. Restatement (Third) of Trusts, *supra* at § 28 comment a ("the common element of charitable purposes is that they are designed to accomplish objects that are beneficial to the community — i.e., to the public or indefinite members thereof").

There is also no requirement that a hospital provide free care to retain its charitable status. See *Barrett* v. *Brooks Hosp., Inc.*,

*supra* at 759, quoting *Little* v. *Newburyport*, 210 Mass. 415, 417 (1912) (charity "not confined to mere almsgiving or the relief of poverty and distress, but has a wider signification, which embraces the improvement and promotion of the happiness of man"). In any event, in addition to free care, Northeast provides considerable treatment and care to patients whose insurance falls far short of reimbursing Northeast for all its expenses. See *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge, supra* at 544 (organization provided "substantial medical services, at a lower than average cost, to a large number of persons who are drawn from all walks of life in the greater Boston area," and "[t]he class of persons potentially benefited by this organization is not so small that the promotion of its health is of no benefit to the community at large").

Nor is Northeast's charitable purposes negated because it is one of several entities, some of which are for profit, integrated into a single corporate structure. While Conners attacks the charitable status of Northeast because of the manner in which it has adapted to the new economic realities of delivering "care and treatment of the sick" in a rapidly evolving, expensive, and highly regulated environment, her real argument is that this court should significantly revise the concept of "charity" under § 85K, at least as it applies to hospitals. We recognize that there is a vigorous and ongoing debate provoked by the dramatically changing landscape of the health care industry regarding the charitable treatment of health care institutions.[6] We presume that the Legislature is aware of the significant changes in the

---

[6]The debate has focused primarily on the validity of tax-exempt status for such organizations. See, e.g., Sackett, Conversion of Not-for-profit Health Care Providers: A Proposal for Federal Guidelines on Mandated Charitable Foundations, 10 Stan. L. & Pol'y Rev. 247 (1999) (proposing solutions to ease transition for health care organizations making transition from converting from nonprofit to for-profit entities); Comment, Integrated Delivery Systems — The "Promised Land" of Health Care: Obtaining a Federal Income Tax Exemption as a Nonprofit Organization under Section 501(c)(3) of the Internal Revenue Code, 20 U. Dayton L. Rev. 203 (1994) (discussing ways in which integrated health delivery systems can maintain charitable status for Federal tax exemption purposes); Developments in the Law — Nonprofit Corporations, 105 Harv. L. Rev. 1578, 1629-1633 (1992) (discussing debate regarding propriety of tax exemption for health care institutions). See also O'Neill, Charitable Immunity: The Time to End Laissez-Faire Health Care in Massachusetts has Come, 82 Mass. L. Rev. 223, 231 (1997) (arguing statutory cap

delivery of health care, but it has nevertheless taken no action regarding the statutory limitation of liability of charitable hospitals in response to these developments. The promotion of health remains, as it long has, a charitable purpose. The argument that large nonprofit health organizations, funded in substantial part by insurance, government and private, should no longer benefit from tax exemption or charitable immunity is more appropriately addressed to the Legislature. See *Keene* v. *Brigham & Women's Hosp., ante* 223, 242 (2003).

(b) *The limitation on liability.* Conners's statutory argument, that Northeast's removal of snow from the parking lot did not "accomplish directly" its charitable purposes, G. L. c. 231, § 85K, is equally unavailing. Conners contends that the snow removal activities were undertaken pursuant to a "commercial lease," and that the purpose of the lease was "to create patient revenue," not to promote health, the hospital's charitable purpose. See *id.* at 239 ("a charitable corporation must be engaged in its charitable purpose to enjoy the benefit of the cap [on damages]").

The revenue-generating aspects of the relationship between Northeast and the physicians' practice groups do not detract from the charitable purposes of the activities. Use of the parking lot was not limited to employees or visitors of The Medical Building, but was available to anyone in need of medical attention at the hospital. See *Enman* v. *Trustees of Boston Univ.*, 270 Mass. 299 (1930) (charitable immunity for torts committed in course of maintaining sidewalk in front of dormitory). We agree with the judge that maintaining the entire hospital campus, including undertaking snow removal on the B-2 parking lot, "accomplish[ed] directly" Northeast's charitable purposes for at least two reasons. The snow removal activities facilitated the care and treatment of the sick, providing a convenient means of access, i.e., parking, to patients seeking treatment. Additionally, the location of The Medical Building on the campus augmented and enhanced the medical care and treatment offered both to

on damages for health care institutions should be abolished). Even though cases of tax exemption are not necessarily pertinent in determining charitable status for purposes of a limitation on damages, see *Barrett* v. *Brooks Hosp., Inc.*, 338 Mass. 754, 762 (1959), we note that hospitals such as Northeast continue to receive favorable Federal tax treatment.

Northeast's patients and the wider community, who, according to undisputed testimony, benefited from the physical proximity of the physicians' practice groups and the hospital.

Conners advances a further argument: even if Northeast is a charity that maintained the parking lot to advance its charitable purposes, Northeast may not benefit from the statutory cap because the tort was committed in the course of activities "primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes." G. L. c. 231, § 85K. Relying on *Missett* v. *Cardinal Cushing High Sch.*, 43 Mass. App. Ct. 5 (1997), the judge concluded that Northeast's snow removal activities were not "primarily commercial" in nature because Northeast did not derive any revenue from the snow removal operations, was not operating a "full-fledged" snow removal business, and was not engaged in an activity that was "entirely disconnected" from the charity's purpose. *Id.* at 11. We agree with the judge's conclusion, but for somewhat different reasons.

To determine whether the statutory limitation on liability applies in a given case, Conners elevates the "primarily commercial" analysis of § 85K's second sentence to a separate test, independent of the "accomplished directly" analysis set forth in the first sentence. The two considerations denoted in the statute are not independent. Having determined, correctly, that the hospital's activity challenged by Conners "accomplished directly" the charitable purposes of Northeast, it was not necessary for the judge to consider whether those activities were "primarily commercial in character." We reach this conclusion by parsing and construing each phrase of § 85K so that each word is "given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute, so that the enactment considered as a whole shall constitute a consistent and harmonious statutory provision capable of effectuating the presumed intention of the Legislature." *Globe Newspaper Co.* v. *Commissioner of Educ.*, *ante* 124, 129 (2003), quoting *Bolster* v. *Commissioner of Corps. & Taxation*, 319 Mass. 81, 84-85 (1946).

The first clause of the first sentence of § 85K abolishes charitable immunity, and is not at issue here. The second clause

of the first sentence then qualifies the abrogation of charitable immunity by limiting the liability for tort damages to only those activities that "accomplish directly the charitable purposes." G. L. c. 231, § 85K. If a charity's activity does so, which is a question of fact, the activity, ipso facto, is subject to the limitation on liability. No further inquiry is necessary.

The second sentence of § 85K ("primarily commercial") clarifies the Legislature's intent in circumstances where the questioned activity of a charity is one that generates revenue: that sentence directs the fact finder to consider, among other things, whether the activity is a money-making enterprise merely designed to keep the charity afloat, in which case the limitation does not apply, or whether the revenue is generated by an activity accomplishing the purpose of the charity. See, e.g., *Phipps* v. *Aptucxet Post #5988 V.F.W. Bldg. Ass'n*, 7 Mass. App. Ct. 928, 930 (1979) (no limitation on damages where tort committed in course of regular weekend dance opened to general public that generated bulk of charity's general operating revenue). Thus, a charitable organization may not avail itself of the limitation by claiming that its revenue-generating activity has a general salutary effect. See *McKay* v. *Morgan Memorial Coop. Indus. & Stores, Inc.*, 272 Mass. 121, 123, 125-126 (1930) (not enough that revenue generating activity provided "general uplift" to people in difficult circumstances where activity itself did not carry out "charitable objects" of extending relief to poor and giving religious instruction).[7] If the revenue-generating activity is indeed "primarily commercial," it cannot "accomplish directly" the charitable work of the organization. Conversely, a revenue-generating activity may, and in many circumstances

---

[7]The statutory language adopted by the Legislature, G. L. c. 231, § 85K, is all but identical to language contained in that case, see *McKay* v. *Morgan Memorial Coop. Indus. & Stores, Inc.*, 272 Mass. 121, 125-126 (1930). *McKay* enunciated the dichotomy between activities that were *"primarily commercial* in character carried on to obtain revenue to be used for charitable purposes" and "activities carried on to *accomplish directly* the charitable purposes of the corporation, incidentally yielding revenue" (emphasis added). *Id.* at 124. It is clear that, if an activity is "primarily commercial in character," then it does not "accomplish directly any specific charitable purpose to which the receipt of money was merely incidental." *Id.* at 126. Conversely, an activity that accomplishes directly the purposes of a charity is not "primarily commercial."

does, "accomplish directly" the organization's purpose. See *Grueninger* v. *President & Fellows of Harvard College*, 343 Mass. 338, 340 (1961) (charitable corporation not liable for activities that "incidentally yield revenue"); *Missett* v. *Cardinal Cushing High Sch.*, *supra* at 11 ("Generating revenue does not alone mean that an activity is 'primarily commercial' "). The "critical question" is whether the revenue-generating activity is "in conformity with the [corporation's] . . . charitable corporate purposes." *Mason* v. *Southern New England Conference Ass'n of Seventh-Day Adventists*, 696 F.2d 135, 140 (1st Cir. 1982).

We have already concluded, as did the judge, that the lease by Northeast of a portion of its grounds for use as a medical office building housing physicians on the hospital's staff and with admitting privileges, and the attendant snow removal activities directly accomplishes Northeast's charitable purposes. No further inquiry is required.[8]

3. *The jury instructions.* We find no merit in Conners's argument that the judge erred by not instructing the jury to consider, in evaluating the subcontractors' duty of care and breach, whether they complied with the terms of their contracts with Northeast and, more generally, with the standard of care in the snow removal industry. On the issues of duty of care and breach, the judge instructed the jury that each of the subcontractors had "a duty to use reasonable care in the performance of his duties" and an obligation to perform the duties in a "diligent and workmanlike manner." These instructions were legally adequate.[9] See *Washington* v. *Sullivan*, 357 Mass. 766, 767 (1970) ("Whether a charge is legally correct or adequate

---

[8]Conners also argues that the statutory cap violates her equal protection and substantive due process rights of the Massachusetts Declaration of Rights, as amended, and the Fourteenth Amendment to the United States Constitution, effectively asking us to overrule our decision in *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423 (1989), cert. denied, 493 U.S. 1056 (1990). We again decline to do so. See *Keene* v. *Brigham & Women's Hosp., Inc.*, *ante* 223 (2003) (reducing award of $4,108,311 [plus interest] to $20,000). See also *Harlow* v. *Chin*, 405 Mass. 697 (1989) (reducing jury verdict from $6,660,720 to $20,000).

[9]Conners's cause of action against the subcontractors undertaking the snow removal, as stated in her complaint, was based in tort, not contract. Moreover, although negligent performance of a contract may give rise to a tort action against a contractor for a third party lacking privity of contract, see *Mc-*

depends on the charge considered as a whole"); *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 503 (1997) ("Every possible correct statement of law need not, however, be included in jury instructions if the instructions as given are correct and touch on the fundamental elements of the claim").

*Judgment affirmed.*

IRELAND, J. (concurring). I agree that our result in this case is mandated by G. L. c. 231, § 85K, but as I have written before, I am concerned when statutes are used to shield responsible parties from liability. See *Barnett* v. *Lynn*, 433 Mass. 662, 667-668 (2001) (Ireland, J., concurring); *Brum* v. *Dartmouth*, 428 Mass. 684, 708 (1999) (Ireland, J., concurring). I disagree, however, with the court's contention that § 85K fairly "balances" the interests of the charitable organization against those of the injured citizen. *Ante* at 473. The statute is not only monetarily outdated, but also fails to recognize the evolving roles of traditionally charitable institutions. See *Keene* v. *Brigham & Women's Hosp., Inc.*, *ante* 223, 246-247 (2003) (Ireland, J., dissenting) (majority of jurisdictions recognize abrogation of liability in certain fields no longer makes sense). I call on the Legislature to address this problem.

---

*Donough* v. *Whalen*, 365 Mass. 506, 512 (1974), the judge correctly concluded that there was no evidence that Conners was an intended beneficiary of the contract between Northeast and the contractors. See *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366 (1997) (requiring "clear and definite" evidence that third party was intended beneficiary).